802 A.2d 1029

**ANNAPOLIS MARKET PLACE, L.L.C.,**

v.

**John N. PARKER, Sr., et al.**

**No. 46, Sept. Term, 2001.**

Court of Appeals of Maryland.

July 18, 2002.

690

Charles F. Delavan and Eileen E. Powers (Blumenthal, Delavan & Williams, P.A., on brief), Annapolis, for petitioner.

Sarah M. Iliff, Sr. Asst. County Atty. (Linda M. Schuett, County Atty., on brief), Annapolis, for respondents.

Barbara J. Palmer (Krause & Ferris, on brief), Annapolis, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

HARRELL, Judge.

Petitioner (Annapolis Market Place, L.L.C.) applied for and eventually was denied zoning reclassification of property it owned in Anne Arundel County. At each level of administrative and judicial consideration of Petitioner's application, compliance with Anne Arundel County's "Standards and proce-

dures for granting or denying rezoning" was the required focus. Anne Arundel County Code ("County Code"), Article 3, § 2–105. Of greatest debate was (and is) the meaning and scope of County Code, Art. 3, § 2–105(a)(3),[1] which provides that:

> (a) Rezonings shall be granted or denied in accordance with appropriate zoning regulations, but a rezoning may not be granted except on the basis of an affirmative finding that:
>
> . . . .
>
> (3) transportation facilities, water and sewerage systems, storm drainage systems, schools, and fire suppression facilities adequate to serve the uses allowed by the new zoning classification, as defined in Article 26, Title 2, Subtitle 4, Part 2 of this Code, are either in existence or programmed for construction; . . . .

According to Petitioner, the reference in § 2–105(a)(3) to "Article 26, Title 2, Subtitle 4, Part 2 of this Code," the "Adequacy of Facilities" part of the "Subdivision" Article ("the AOF Part") of the County Code, necessarily incorporates the entirety of that part.[2] Specifically, Petitioner identifies a

---

**1.** All citations are to the 1999 Anne Arundel County Code, which was in effect at the time of final administrative action on Petitioner's application for zoning reclassification. We will note, where relevant, if the Code has been subsequently amended. *See infra* note 17.

In addition, unless otherwise provided, all statutory references are to Anne Arundel County Code, Article 3, § 2–105 (1999).

**2.** Generally, an adequate public facilities regulation

conditions development approval upon a finding that community infrastructure can sustain a project's anticipated impacts. It may be adopted in response to a crisis in existing capacity to accommodate growth, or a financial overburden on services required for new development. Adequate facilities provisions may be part of zoning, or subdivision ordinances, or administered as a special permit or other discretionary review process.

2 RATHKOPF ET AL., THE LAW OF ZONING AND PLANNING § 15:28 (2001) (footnotes omitted). *See also Managing Maryland's Growth: Models and Guidelines—Adequate Public Facilities,* Maryland Office of Planning, June 1996, at 1 (explaining that adequate public facilities regulations are "designed to curtail development in areas where public

number of sections within the AOF Part which provide, as an alternative to the actual existence of the needed facilities to serve the proposed development, that a developer's agreement, proffered at the time subdivision approval is sought, to provide the needed facilities may satisfy the adequacy requirements. By parity of reasoning, Petitioner maintains that a developer's agreement at rezoning should satisfy the requirement that adequate facilities are "either in existence or programmed for construction." [3] On the other hand, Respon-

---

facilities are inadequate, and to delay development in planned growth areas until adequate service levels are in place or reasonably assured.").

Anne Arundel County first adopted an adequate public facilities regulation in 1978. *See infra* page 21. At the time of final administrative action on Petitioner's application (the current Code provisions are similar), §§ 2–409 2–420 of Article 26 of the Anne Arundel County Code contained descriptions of factors which were required to demonstrate that various facilities (fire suppression (County Code, Art. 26, § 2–414), roads (County Code, Art. 26, § 2–415), schools (County Code, Art. 26, § 2–416), sewerage (County Code, Art. 26, § 2–417), storm drainage (County Code, Art. 26, § 2–418), and water (County Code, Art. 26, § 2–419)) were adequate to serve a proposed subdivision. Pursuant to County Code, Art. 26, § 2–413, "[t]he Planning and Zoning Officer may not approve a final subdivision plat unless the Planning and Zoning Officer determines that the proposed subdivision complies with" those sections.

3. In particular, Petitioner cites County Code, Art. 26, § 2–415(c), entitled "Roads," which, at the time of the Board's decision in this case, provided, in pertinent part that:

(c) [A]ccess roads shall be considered adequate to accommodate the traffic projected to be generated by the proposed subdivision if:

(1) existing County roads and State roads in all directions from each point of entrance to and exit from the proposed subdivision, through the intersection with the first arterial or major highway, and along the arterial or major highway in both directions, to the next intersecting arterial or major highway:

(i) are capable of accommodating at a minimum of "D" level service, as defined by the most current edition of the highway capacity manual published by the Transportation Research Board or the critical lane technique set forth in the traffic engineering guidelines for intersection analyses:

1. existing traffic;

2. traffic projected to be generated from other subdivisions for which final plats have been approved;

3. traffic projected to be generated as a result of the issuance of all major building permits not requiring subdivision approval, but generating more than 250 vehicle trips per day; and

dents in this case (Anne Arundel County and neighboring homeowners) maintain that the reference in § 2–105(a)(3) to the AOF Part does not incorporate, by its terms, each of the alternative means provided in the AOF Part for establishing that facilities are, or will be, adequate. According to Respondents, Petitioner does not satisfy the requirement for a zoning reclassification because it did not demonstrate that the enu-

4. traffic projected to be generated from the proposed subdivision; and

(ii) have an adequacy rating of not less than 70 as defined by the Anne Arundel County road rating program or, if not rated by the Anne Arundel County road rating program, have been found by the County to be adequate with respect to road capacity, alignment, sight distance, structural condition, design, and lane width, considering all sources of traffic enumerated in item (i) of this paragraph;

(2) there is an appropriation for at least 30% of the construction cost with the remainder programmed for construction in the County's current adopted capital program or the current State consolidated transportation program for any additional roads or road improvements that in combination with existing roads and intersections would meet the standards of paragraph (1) of this subsection;

(3) a subdivider agrees to undertake construction of roads, road improvements or traffic signals, or other traffic-mitigating measures such as ridesharing programs, off-site parking facilities and paratransit, in order to comply with the requirements of paragraph (1) of this subsection; or

(4) a subdivider:

(i) demonstrates that traffic volume at a particular location is primarily attributable to regional development and traffic patterns; and

(ii) agrees to undertake construction of roads, road improvements, or other traffic-mitigating measures that offset more than the developer's own impact.

In June 2000, County Code, Art. 26, § 2–415(c)(2) was amended. *See* Anne Arundel County Council, Bill No. 18–00 (9 June 2000). That subsection now provides that access roads "shall be considered adequate to accommodate the traffic projected to be generated by the proposed subdivision" if:

(2) there is an appropriation for at least 30% of the construction cost with the remainder programmed for construction in the County's current adopted capital program or the current State consolidated transportation program, all applicable Federal, State, and County permits have been approved, and rights-of-way have been assured through agreement, dedication, or conveyance for any additional roads or road improvements that in combination with existing roads and intersections would meet the standards of paragraph (1) of this subsection; . . . .

*See* Anne Arundel County Council, Bill. No. 18–00, § 2.

merated facilities were in existence or programmed for construction in the relevant governmental capital improvements program (the County's or the State Highway Administration's).

We granted Petitioner's writ of certiorari, *Annapolis Mkt. v. Parker*, 364 Md. 534, 774 A.2d 408 (2001), to address the meaning of Art. 3, § 2–105(a)(3) of the County Code. Petitioner presents the following rephrased question for our review:

Whether, in determining if public facilities are adequate to support a zoning reclassification under Anne Arundel County Code, Art. 3, § 2–105(a)(3), which requires adequate public facilities (defined by reference to the Adequacy of Facilities ordinance) to be "either in existence or programmed for construction," the Anne Arundel County Board of Appeals may consider evidence of future improvements to existing facilities agreed to be undertaken by a developer.

## I. *Relevant Background*

Petitioner [4] owns 32.93 acres of real property ("the Property") located in Annapolis, Maryland. As described by the Court of Special Appeals,

[t]he Property fronts Bestgate Road, a four-lane divided highway with a raised medium strip. A portion of the Property contains steep slopes and nontidal wetlands close to Cabin Branch, which drains into Saltworks Creek. A Baltimore Gas and Electric overhead utility line transverses the northeast portion of the Property.

The land to the immediate west of the Property is zoned W[ ]1[-]Industrial and developed as the Annapolis Commercial Park, a 400,000 square foot industrial park. Adjacent to the Property to the east is a cemetery and a church. That

---

4. Annapolis Developers Associates, Inc. ("Annapolis Developers") was the initial applicant for reclassification of the property at issue in this case. At some time after the Circuit Court proceeding, for reasons not revealed in the record, Annapolis Market Place, L.L.C., a subsidiary of Annapolis Developers, replaced Annapolis Developers as the named applicant for reclassification.

property is zoned residential. Two residential subdivisions, Woodlawn and Saltworks on the Severn, lie to the north of the Property. These subdivisions do not have access to Bestgate Road and are separated from the site by Cabin Branch. Across Bestgate Road to the west of the Property is a large, commercial EPA building and land zoned Town center. The Property is within clear sight of the Annapolis Mall.

Approximately 30 acres of the Property are zoned R5 Residential; the remaining two acres are zoned R1 Residential. [Petitioner] sought to build a "novel mix-use" development that would integrate residential, commercial, and retail uses in one location. The project was described as "a street with offices and residential over retail, a town square, that it stands to a community building which looks out to this stream valley park." The northern portion of the Property, in the area of Cabin Branch, would not be developed. [Petitioner] was advised by County officials that such a project could be accomplished only by C3 Commercial zoning.[5]

On 3 March 1998, Petitioner filed an application to rezone the Property to C3 Commercial. Pursuant to County Code, Art. 28, § 11–102(b), Petitioner, as an "applicant for rezoning," had the "burden of proof, including the burden of going forward with the evidence and the burden of persuasion, with respect to any question of fact." As provided in County Code, Art. 28, § 11–102(c),[6] the rezoning could not be granted "except on the basis of an affirmative finding that":

---

**5.** As described in County Code, Art. 28, § 3–301, "[t]he purpose of a C3 General Commercial District is to provide a variety of large retail stores and related activities on prime retail land to serve the entire regional community." In addition to the myriad of retail establishments classified as permitted uses in a C3–General Commercial District, there are a number of uses permitted as conditional uses, including apartments, planned commercial complexes, and townhouses. *See* County Code, Art. 28, §§ 3–303(b). The C3 Commercial zone is a Euclidean zoning classification.

**6.** The requirements of County Code, Art. 28, § 11–102(c) are identical to those of County Code, Art. 3, § 2–105(a), the meaning of which is at

(1) there was a mistake in the zoning map or the character of the neighborhood has changed to such an extent that the zoning map should be changed;

(2) the new zoning classification conforms to the County General Development Plan in relation to land use, number of dwelling units or type and intensity of nonresidential buildings, and location;

(3) transportation facilities, water and sewerage systems, storm drainage systems, schools, and fire suppression facilities adequate to serve the uses allowed by the new zoning classification, as defined in Article 26, Title 2, Subtitle 4, Part 2 of this Code, are either in existence or programmed for construction; [and]

(4) there is compatibility between the uses of the property as reclassified and the surrounding land uses, so as to promote the health, safety, and welfare of present and future residents of the County; .... [7]

Following a hearing, the County's Administrative Hearing Officer, on 15 July 1998, denied Petitioner's application for a zoning reclassification. According to the Hearing Officer, Petitioner had not met its burden of proof "with respect to the issue of change ...." *See* County Code, Art. 28, § 11–102(c)(1). Petitioner appealed the decision of the Hearing Officer to the Anne Arundel County Board of Appeals ("the Board"). *See* County Code, Art. 3, § 1–104 ("A ... corporation ... aggrieved by a decision of the Administrative Hearing Officer may appeal the decision to the County Board of Appeals."). Pursuant to County Code, Art. 3, § 2–105(a), the Board, in order to grant the reclassification, was required to render affirmative findings regarding the same factors as

---

issue in this case. The former may be found in the "Zoning" Article of the County Code, while the latter is located in the "Board of Appeals" Article of the County Code.

7. The fifth and final requirement of County Code, Art. 28, § 11–102(c) (and County Code, Art. 3, § 2–105(a)) relates to property located in the Chesapeake Bay Critical Area. The Property in this case is not located in that area.

were at issue at the first administrative hearing. *See supra* note 6 and accompanying text.

Relevant to this appeal, Petitioner, in the hearing before the Board, presented evidence regarding water supply systems, on-site storm drainage systems, sewerage systems, and roads. It did not present any direct evidence regarding fire suppression facilities, off-site storm drainage systems,[8] or schools. On 21 May 1999, the Board nonetheless determined "that the Petitioner ha[d] presented sufficient evidence to meet the standards for the requested rezoning." It made the following findings and conclusions regarding the requirements of § 2–105(a)(3):

> The public facilities are adequate to serve the uses permitted by the C3 zoning classification. *See* Art. 3, Section 2–105(a)(3). The Board finds persuasive the testimony of the Petitioner's expert engineer, Mr. Terry Schuman, regarding adequacy of facilities. He described the water, sewer and storm drainage systems that would be utilized by the subject property. It is his opinion that the systems would be adequate to serve the uses permitted within the C3 zone. Indeed, Mr. Dooley[9] testified that there were no issues related to adequacy of public facilities except for transportation facilities. With regard to testimony by Ms. Catherine Bartelman,[10] the Board finds the proposed location of storm water management facilities by the Petitioner may not reflect the final location or size thereof. There was no showing, however, that the construction of storm water

---

**8.** According to the Court of Special Appeals, "no mention was made of an off-site [storm drainage] system or the requirements of [Art. 26,] § 2–418(b)(2)" before the Board. Petitioner asserted at oral argument before the intermediate appellate court, however, "that there would be no need for an off-site system, as the property naturally drains into [Saltworks] [C]reek."

**9.** Anne Arundel County (Respondent) presented testimony and a report from Mr. Kevin Dooley, a zoning analyst. ·

**10.** The neighboring homeowners (Respondents) presented testimony from Ms. Catherine Bartelman, an engineer, regarding storm drainage systems.

management facilities on the subject site would be impossible or insufficient to control the storm water runoff therefrom. The Board notes that the County requires that future developments not affect or decrease the velocity and quantity of storm drainage and the County will review plans for storm water management prior to the approval of any development of the site.

The Board also concludes that the transportation facilities will be adequate to serve the uses proposed by the C3 zoning classification. The Board finds persuasive the testimony of Mr. Schmid [11] relative to the transportation network in the neighborhood. Mr. Schmid noted that several improvements to the roadway network would be required in order for any development of this site to meet the adequacy of transportation facilities requirement. The Boards [sic] finds that the accomplishment of the proposed traffic improvements is reasonably probable of fruition. *See Montgomery Co. v. Greater Colesville Ass'n, Inc.,* 70 Md.App. 374, 521 A.2d 770 (1987). Additionally, the Board notes improvements to transportation facilities will be required prior to approval of any subdivision of this Property. Specifically, Council Bill 72–86 ... provides that roads shall be considered adequate if road improvements or other mitigating efforts are provided by the subdivider.[12] No development can take place on the subject site without meeting the requirements of adequacy of transportation facilities.

The Chairman of the Board dissented from the Board's opinion. In his dissent, the Chairman maintained that Petitioner did not meet its burden in satisfying the rezoning standards of § 2–105(a). Specifically, the Chairman contended that Petitioner failed to establish the adequacy of transpor-

---

11. Petitioner presented testimony from Mr. Kenneth Schmid, a traffic engineer, regarding transportation facilities.

12. Council Bill 72–86 of the 1986 Legislative Session of the County Council of Anne Arundel County is an earlier version of current County Code, Art. 26, § 2–415, regarding the adequacy of roads for a proposed subdivision.

tation facilities because the necessary improvements to the problem intersections were "not programmed for construction." *See* § 2–105(a)(3). In addition, the Chairman noted that "there [wa]s not one scintilla of evidence that indicate[d] that schools [we]re adequate to serve the development of th[e] [P]roperty with apartments as proposed by the Petitioner."

On 18 June 1999, neighboring homeowners of the Property filed a Petition for Judicial Review of the Board's decision in the Circuit Court for Anne Arundel County. Sometime later, Anne Arundel County moved for and was granted leave to intervene in the proceeding.[13] According to Respondents, the Board ignored the requirements of § 2–105(a)(3) mandating that it find adequate facilities either be "in existence or programmed for construction" in order to grant a reclassification. Specifically, Respondents maintained that the Board erred in applying the "reasonably probable of fruition" standard in its consideration of transportation facilities, and it mistakenly granted the reclassification where neither adequate storm drainage systems or adequate schools were shown to be "in existence or programmed for construction." Petitioner, on the other hand, supported the application of the "reasonably probable of fruition" standard to transportation facilities and argued that the Board's determination regarding the feasibility of storm drainage systems was "within the province of the Board."

The Circuit Court reversed the order of the Board. In its opinion and order of 15 February 2000, the Circuit Court concluded "that the Board ... was incorrect in finding that the adequate facilities ordinance was complied with" because "no storm water management plan was ever presented to the Board" and "no showing was made that the schools in the area were adequate under a C[ ]3[-]zoning classification." In addition, the Circuit Court also held that a developer's "promises to make [traffic] improvements" did not satisfy the require-

---

13. In this appeal, we refer collectively to the neighboring homeowners and Anne Arundel County as "Respondents."

ment of being either "in existence or programmed for construction." According to the Circuit Court, Petitioner's argument that "a promise of [adequate] facilities" is sufficient under § 2–105(a)(3) "flies in the face of" the statute.

Petitioner filed a timely appeal to the Court of Special Appeals. In its brief, Petitioner maintained that the Board "conducted a thorough and fair fact-finding hearing on [the] application for zoning reclassification ...." In addition, Petitioner argued that the reference in § 2–105(a)(3) to the AOF Part permitted the Board to include a developer's promise to provide adequate facilities in the definition of "in existence or programmed for construction." Respondents, on the other hand, maintained that the Board "ignored the plain language of the Code which specifically requires adequate traffic facilities to be either 'in existence or programmed for construction,' " and contended that Petitioner's reliance on the AOF Part was "fundamentally flawed." Respondents also argued that the Circuit Court correctly reversed the Board's action granting Petitioner's application for reclassification because "the record [wa]s devoid of information on issues for which [Petitioner] h[eld] the burden of proof," i.e. the adequacy of storm drainage systems and schools.

In an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. Although the Court of Special Appeals "recognize[d] that § 2–105(a)(3) refers to the subdivision regulations of Art[icle] 26," it read that reference as relating to the "definitional aspects of 'adequate' as outlined in [§ ] 2–415(c)(1)," but not the acceptable levels of what constitutes the actual or theoretical existence of any facility for land use decision purposes. Therefore, "the Board erred, as a matter of law, in disregarding the plain language of the statute that requires that adequate facilities be 'in existence or programmed for construction,' " the latter of which the intermediate appellate court found did not include a developer's promise. The Court of Special Appeals also noted that § 2–105(a)(3) requires that "adequate off-site storm water drainage systems" and adequate schools be "in existence or programmed for construction before a rezoning may be grant-

ed." According to the intermediate appellate court, facts regarding the off-site storm water drainage system were not "clearly established in the record," and Petitioner "failed to direct [the court] to any evidence supporting a finding that . . . schools were adequate to support the rezoned property."

We shall supply additional factual content *infra* as necessary in the application of our analysis.

## II.

"We review an administrative agency's decision under the same statutory standards as the Circuit Court. Therefore, we reevaluate the decision of the agency, not the decision of the lower court. Moreover, in *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, [576–77,] 650 A.2d 226, [230] (1994), we stated generally that '[j]udicial review of administrative agency action is narrow. The court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency.'

"We expounded upon this doctrine in *Board of Physician* [*Quality Assurance* ] *v. Banks,* 354 Md. 59, 729 A.2d 376 (1999):

> Despite some unfortunate language that has crept into a few of our opinions, a 'court's task in review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency.' . . . Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statue [sic] which the agency administers should ordinarily be given considerable weight by reviewing courts. . . . Furthermore, the expertise of the agency in its own field should be respected.'

*Banks,* 354 Md. at 68–69, 729 A.2d at 381.

"We, however, 'may always determine whether the administrative agency made an error of law. Therefore, ordinarily the court reviewing a final decision of an administrative

agency shall determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision.' *Balt. Lutheran High Sch. v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985). Regarding the substantial evidence test, we explained in *Baltimore Lutheran High School:*

> That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency.

*Balt. Lutheran High Sch.*, 302 Md. at 662, 490 A.2d at 708. Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' In *Baltimore Lutheran High Sch[ool ]*, we further explained:

> The scope of review is limited to whether a reasoning mind could have reached the factual conclusion the agency reached. In applying the substantial evidence test, the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken. The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity. Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.

*Balt. Lutheran High Sch.*, 302 Md. at 662–63, 490 A.2d at 708 (citing *Bulluck* [*v. Pelham Wood Apartments* ], 283 Md. [505,] 512, 390 A.2d [1119,] 1123 [ (1978) ] ).

*Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.*, 369 Md. 439, 449–52, 800 A.2d 768 (2002) (quoting *Gigeous v. E. Corr. Inst.*, 363 Md. 481, 495–97, 769 A.2d 912, 921–22 (2001) (footnote omitted)) (some citations omitted) (omissions in original).

■ As we have explained, this case requires us to interpret Anne Arundel County Code, Art. 3, § 2–105(a)(3), which provides that in order to grant a zoning reclassification, the Anne Arundel County Board of Appeals must make an affirmative finding or findings [14] that:

> transportation facilities, water and sewerage systems, storm drainage systems, schools, and fire suppression facilities adequate to serve the uses allowed by the new zoning classification, as defined in Article 26, Title 2, Subtitle 4, Part 2 of this Code, are either in existence or programmed for construction.

Referenced in that subsection, "Article 26, Title 2, Subtitle 4, Part 2 of this Code" delineates the factors required to establish that fire suppression facilities (County Code, Art. 26, § 2–414), roads (County Code, Art. 26, § 2–415), schools (County Code, Art. 26, § 2–416), sewerage systems (County Code, Art. 26, § 2–417), storm drainage systems (County Code, Art. 26, § 2–418), and water supply systems (County Code, Art. 26, § 2–419) are adequate for purposes of subdivision plat consideration. In particular, the AOF sections enumerate the operational adequacy requirements of the individual facilities (i.e. the level of use the facility must be capable of handling),[15] and

---

**14.** It is conceivable that, due to a specific type of proposed development, one or more of the categories of facilities itemized may not be relevant in a particular case. For example, a proposed exclusively commercial retail development, because it would not generate school children, would have no direct impact on school capacity. In such a case, rather than making an affirmative finding of adequacy of schools, the Board would be expected to articulate an explanation for why the application did not implicate adequacy questions regarding the irrelevant facility category.

**15.** For example, as provided in County Code, Art. 26, § 2–419:

> (b) A public community water supply system shall be considered adequate if, taking into account demands on the system generated or projected to be generated by existing connections, buildings under construction that will be connected to the system, buildings unconnected but required by law to connect to the system, buildable approved lots for which building permits have not been issued in active subdivisions served by the system, properties using individual water supply systems that will be required by law to connect to the

provide the acceptable levels of commitment to bring any needed improvements to fruition. Depending on the nature of the facility, a number of alternate levels of commitment may be acceptable to obtain subdivision plat approval, including: (a) an adequate facility or system of facilities being in existence (*see* County Code, Art. 26, § 2–415(c)(1) (roads); County Code, Art. 26, § 2–416(c) (schools); County Code, Art. 26, § 2–417(b) (public community sewerage systems); County Code, Art. 26, § 2–418(b)(2) (off-site storm drainage systems); County Code, Art. 26, § 2–419(b) (public community water supply systems)); (b) the County awarding a contract of the construction or improvement of the facility to achieve adequacy (*see* County Code, Art. 26, § 2–417(c) (public community sewerage systems); County Code, Art. 26, § 2–418(c) (off-site storm drainage systems); County Code, Art. 26, § 2–419(c) (public community water supply systems)); (c) or the subdivider agreeing to undertake the construction or improvement of the facility to render it operationally adequate (*see* County Code, Art. 26, § 2–414(c)(2) (fire suppression facilities); County Code, Art. 26, §§ 2–415(c)(3), (4) (roads); County Code, Art. 26, §§ 2–417(d), (e) (private community sewerage systems, individual sewerage systems and multiuse sewerage

system on completion of a capital project then under construction or for which funding has been authorized, rights-of-way acquisition completed, construction plans completed (adjusted for degree of inactivity), other buildable approved lots (adjusted for degree of inactivity), and other proposed subdivisions to be served by the system for which final plats have been approved:

(1) source facilities in the service area have sufficient available capacity to provide maximum day demand to the proposed subdivision;

(2) storage tanks in the service area have sufficient available capacity to provide peak hour demand in addition to fire flow to the proposed subdivision;

(3) local pumping stations to provide water to the proposed subdivision have sufficient available capacity to provide maximum day demand where storage facilities are available on the discharge side or have sufficient capacity to provide for fire flow where storage facilities are not available on the discharge side; and

(4) the distribution system is capable of providing normal required pressure and minimum residual pressure to the proposed subdivision under fire flow for the type of development planned.

systems); County Code, Art. 26, §§ 2–418(b), (c) (on-site and off-site storm drainage systems); County Code, Art. 26, §§ 2–419(d), (e) (private community water supply systems, individual water supply systems or multiuse water supply systems)).

Petitioner contends that the reference in § 2–105(a)(3) to the AOF Part incorporates the entirety of the sections within that part, including the various acceptable levels of commitment to bring to fruition the adequacy of the facilities. According to Petitioner, therefore, "[a]dequate facilities are 'programmed for construction,' [under § 2–105(a)(3),] if the County agrees to provide the facility as a public capital project *or* if the developer agrees to construct the facility." Respondents, on the other hand, maintain that the reference in § 2–105(a)(3) to the AOF Part does not incorporate all of the levels of commitment acceptable at subdivision and argue that facilities are only "programmed for construction" if they are provided for in either the County's relevant current adopted capital program or, in the case of state roads, the current State consolidated transportation program. For the following reasons, but in a limited way, we must agree with Respondents.

Pursuant to the rules of statutory interpretation observed in Maryland, the conundrum of words and intent presented in § 2–105(a)(3) and the AOF Part are the starting point for our review of the subsection in question. *See Md. Dep't of the Env't v. Underwood,* 368 Md. 160, 175, 792 A.2d 1130, 1139 (2002) ("[T]he 'cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature,' and the 'primary source of legislative intent is, of course, the language of the statute itself.' ") (citations omitted). As we recently explained in *Underwood,* it is a " 'generally recognized rule of statutory construction that a qualifying clause ordinarily is confined to the immediately preceding words or phrase . . . .' " [16] *Underwood,* 368 Md. at 175–76, 792

---

**16.** Although the statute involved in *Maryland Department of the Environment v. Underwood,* 368 Md. 160, 792 A.2d 1130 (2002), is linguisti-

A.2d at 1139 (quoting *Sullivan v. Dixon*, 280 Md. 444, 451, 373 A.2d 1245, 1249 (1977)). In keeping with that rule, we agree with the Court of Special Appeals that the reference in § 2–105(a)(3) to the AOF Part is intended to modify the first portion of the subsection requiring "facilities adequate to serve the uses allowed by the new zoning classification." *See Md. Div. Of Labor and Indus. v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 420, 784 A.2d 534, 542 (2001) (explaining that "[w]here statutory provisions are 'clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' ") (quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995) (citation omitted)). As written, therefore, § 2–105(a)(3) mandates that, at the time rezoning is considered, facilities must meet the operational adequacy requirements enumerated in the AOF Part of the Subdivision Article.

Standing alone, the qualifying phrase "as defined in Article 26, Title 2, Subtitle 4, Part 2" could also be read to modify the subsequent portion of § 2–105(a)(3), which requires that adequate facilities be "either in existence or programmed for construction." Contrary to Petitioner's interpretation of § 2–105(a)(3), however, the placement of the statutory reference in the middle of § 2–105(a)(3), modifying the first portion of the subsection, prevents such a spillover application of the qualifying phrase to the latter portion of § 2–105(a)(3). *See Webb v. Balt.*, 179 Md. 407, 409, 19 A.2d 704, 705 (1941) ("It appears also that subsequent clauses should not be limited by independent precedent clauses unless the intention be clearly expressed."). As a result, in interpreting the requirement of § 2–105(a)(3) that adequate facilities be "either in existence or programmed for construction," we cannot simply defer, in the absence of clearer legislative intent, to the various levels of commitment permitted in the AOF Part to bring the adequate facilities to fruition. Instead, we must utilize our rules of statutory interpretation in an attempt to "ascertain and effec-

cally different than § 2–105(a)(3), the general rule of statutory construction regarding qualifying phrases is equally applicable here.

tuate the intent of" the Anne Arundel County Council with regards to this provision. *Underwood*, 368 Md. at 175, 792 A.2d at 1139.

■ It is undisputed that the "in existence" portion of § 2–105(a)(3) mandates that adequate facilities be in place at the time of reclassification. Our focus here, therefore, is on the meaning of "programmed for construction." Although the term is not individually defined in the Anne Arundel County Code, it is utilized in the "Roads" section of the AOF Part which provides, in pertinent part, that an access road is adequate if:

> there is an appropriation for at least 30% of the construction cost with the remainder *programmed for construction* in the County's current adopted capital program or the current State consolidated transportation program for any additional roads or road improvements that in combination with existing roads and intersections would meet the [operational adequacy requirements] of this subsection.[17]

County Code, Art. 26, § 2–415(c)(2) (emphasis added). According to Respondents, our interpretation of "programmed for construction" should mirror the use of that term in County Code, Art. 26, § 2–415 and should include only the construction of or improvement to facilities contained in the County's capital improvements program[18] or, where applicable, the

---

**17.** As explained at *supra* note 3, County Code, Art. 26, § 2–415(c)(2) was amended after the Board's decision in this case. In our consideration of this case, however, we apply the version of that subsection as codified at the time Petitioner's application was acted upon finally by the Board. *See County Council of Prince George's County v. Collington Corp. Ctr. I Ltd. P'ship*, 358 Md. 296, 305, 747 A.2d 1219, 1223 (2000) ("It is true that 'as a general rule, statutes are presumed to operate prospectively and are to be construed accordingly.' 'The presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary.' 'Even where permissible, retrospective application is not found except upon the plainest mandate in the legislation.' ") (citations omitted). *See also Arundel Corp. v. County Comm'rs of Carroll County*, 323 Md. 504, 509–10, 594 A.2d 95, 97 (1991).

**18.** Pursuant to County Code, Art. 26, § 1–101(7), " '[c]apital improvements program' means an annual document prepared by the County

prevailing State consolidated transportation program. We agree.

On 18 July 1978, the Anne Arundel County Council ("the County Council") first enacted the "Adequacy of Services and Facilities" Article of the County Code for purposes of subdivision review. *See* Anne Arundel County Council, Bill No. 54–78 (18 July 1978). Similar to the AOF Part in effect at the time of final administrative action on Petitioner's application, the Article included a section, with multiple subsections, regarding the adequacy of water systems, storm drainage systems, sewerage systems, roads, schools, and fire suppression facilities. *See id.* As originally enacted, the "Roads" subsection provided, for purposes of final subdivision plat approval, that adequate access roads be in existence, the County have awarded a contract for their construction, or the subdivider agreed to undertake their construction. *See* Anne Arundel County Council, Bill No. 54–78, § 2. It did not provide that adequate access roads could be "programmed for construction" as such.[19] *See id.*

In direct response to the 1978 enactment, the County Council amended, in the following year, the "Board of Appeals" Title of the County Code to provide, in part, that "in all cases of zoning reclassification," the zoning officer's memorandum "shall include an affirmative finding" that "[t]ransportation facilities, water and sewerage systems, storm drainage systems, schools and fire suppression facilities adequate, as defined in section 13–133 [ (the AOF section) ], to serve the uses allowed by reclassification are either existing or programmed for construction." Anne Arundel County Council, Bill No. 47–79, § 1 (15 May 1979). Although this appears to

indicating County capital projects: (i) that have an authorization for the current fiscal year; or (ii) that ace [sic] currently planned for the following five-year period."

19. With the exception of the "Roads" subsection, the levels of commitment permitted for the facilities in the 1978 enactment remain the same today. *Compare* Anne Arundel County Council, Bill No. 54–78, § 2, *with* County Code, Art. 26, §§ 2–414–2–419.

be the first time that the term "programmed for construction" appeared in the Zoning Article of the Code, at the time of the amendment, Anne Arundel County had a capital program in place "to receive and expend funds for capital projects" (*see* Anne Arundel County Charter, §§ 702–706 (1964)), and provided a definition of "capital improvements program" in the Subdivision Article of the Code (*see* Anne Arundel County Council, Bill No. 76–69, § 2 (1 December 1969)).[20] Therefore, absent a legislative indication to the contrary, we presume the County Council's choice of the word *"programmed"* in the rezoning subsection was directly related to the use of that term in the County's "capital improvements *program.*" (Emphasis added). *See Whack v. State,* 338 Md. 665, 673, 659 A.2d 1347, 1350 (1995) ("When a word susceptible of more than one meaning is repeated in the same statute or sections of a statute, it is presumed that it is used in the same sense."). *See also Graves v. State,* 364 Md. 329, 346, 772 A.2d 1225, 1235 (2001) (" '[A]ll parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible.' ") (quoting *Wheeler v. State,* 281 Md. 593, 596, 380 A.2d 1052, 1055 (1977)); *Whack,* 338 Md. at 673, 659 A.2d at 1350 ("When we are called upon to interpret two statutes that involve the same subject matter, have a common purpose, and form part of the same system,

---

**20.** The County's capital improvements program and capital program are one and the same. At the time of the 1979 amendment to the Board of Appeals Title of the Code, the "capital improvements program" was described as "[a]n annual document prepared by Anne Arundel County indicating county capital projects having an authorization for the current fiscal year and those capital projects which are currently planned for the following five (5) year period." Anne Arundel County Council, Bill No. 76–69, § 2 (1 December 1969). Today, the definition of the County's "capital improvements program" is enumerated, but contains identical information. *See supra* note 18 (quoting County Code, Art. 26, § 1–101(7)). In 1979, the County's "capital program" was "the plan of the County to receive and expend funds for capital projects during the fiscal year covered by the capital budget and the next succeeding five fiscal years thereafter." Anne Arundel County Charter, § 702(d) (1964). The definition of that term remains the same today. *See* Anne Arundel County Charter, § 702(d).

we read them *in pari materia* and construe them harmoniously.").

In support of this finding, following the amendment of the Board of Appeals process for zoning reclassifications, the County Council amended the "Roads" section of the AOF Part to provide, as the Code currently does, that a portion of the construction costs of adequate access roads could be "programmed for construction in the County's current adopted capital program or the current State consolidated transportation program." *See* Anne Arundel County Council, Bill No. 72–86, § 2 (27 October 1986). Because the County Council did not define separately "programmed for construction" at the time of this amendment of the "Roads" section, it is only appropriate to conclude that the drafters utilized the phrase in the "same sense" as in § 2–105(a)(3) of the rezoning requirements. *See Whack,* 338 Md. at 673, 659 A.2d at 1350. As such, the expressed attributes of "programmed for construction" in the "Roads" section reflect the County Council's intention that adequate facilities qualify as "programmed for construction" at rezoning if evidence was adduced that the cost of constructing or improving those facilities needed to achieve adequacy (in the face of the actual and assumed impacts, including that of the proposed rezoning) was included in (1) the County's current adopted capital program, or, where state roads are concerned, (2) the current State consolidated transportation program. Contrary to Petitioner's argument, there is no indication that the County Council intended that "programmed for construction" also include at rezoning a third alternative available at the time of subdivision consideration.[21]

---

21. It may be argued, with some persuasive force, that it is illogical to require that adequate facilities be in existence or programmed for construction in the County's capital improvements plan or the State's consolidated transportation program at rezoning when, later in the developmental process at subdivision, a developer's agreement to provide the facilities is deemed an acceptable alternative. The County's intent, as divined here, is not, however, a wholly irrational scheme. In particular, it provides a means for the County to regulate the public impacts of the development of property at the time of rezoning, and

A literal across-the-board employment of the "programmed for construction" requirement of § 2–105(a)(3) in conjunction with the operational adequacy requirements of the AOF Part, however, is not without inherent limitation in its application. For example, as provided in the "storm drainage" section of the AOF Part,

(b) A storm drainage system shall be considered adequate if:

(1) the on-site drainage system installed by the subdivider will be capable of conveying through and from the property the design flow of storm water runoff originating in the subdivision, as determined in accordance with criteria specified in the Design Manual, in addition to flows from upstream subdivisions for which plats have been recorded and other approved development and undeveloped land upstream in the natural watershed of the proposed subdivision, without resulting in erosion, sedimentation or flooding of the receiving channel and downstream properties; ....

County Code, Art. 26, § 2–418(b)(1). Consistent with an interpretation of § 2–105(a)(3) as thus far explained in this opinion, the above subsection would require that at rezoning a "capable" on-site drainage system "installed by the subdivider" be "programmed for construction" in the County's capital improvements program. By its own terms, this interpretation

---

also provides an assurance that, regardless of the development plan for the property, facilities will be adequate to serve the desired reclassification. It also precludes frustration of the County's capital improvements planning process by the introduction of unassumed capacity impacts. At subdivision, if the developer were to agree to provide the programmed improvement, the County may re-assign the public funds to another project and thereby indirect public benefits flow from the developer's provision of the facility. We note that this case does not present a situation where the County seeks to impose an adequacy of facilities test solely at the point of the building permit application stage.

We need not dwell on whether the County's apparent choice to structure its zoning and subdivision adequacy of facilities requirements in this way could be more logical, more beneficent to the applicant's desires, or is in step with the way adjacent political subdivisions address the question. It is sufficient to our role and purpose to observe that the County's apparent choice is not arbitrary or capricious on its face.

erroneously requires two incompatible levels of commitment to bring the adequate facilities to fruition—future installation by the subdivider and, at the same time, the potential dedication of governmental resources for the project. *See Triangle,* 366 Md. at 425–26, 784 A.2d at 545 (explaining that it is "a natural presumption that the Legislature 'does not intend to use words in vain or to leave a part of its enactment without sense or meaning, but intends that every part of it shall be operative.' It is for that reason that we avoid reading a statute in such a way as to render a word or phrase 'surplusage, superfluous, meaningless, or nugatory.' ") (quoting *Welsh v. Kuntz,* 196 Md. 86, 98, 75 A.2d 343, 348 (1950); *Atkinson v. State,* 331 Md. 199, 209, 627 A.2d 1019, 1024 (1993) (citation omitted)).

By the same token, even if we were to read "installed by the subdivider" out of County Code, Art. 26, § 2–418(b), mandating that on-site drainage systems be "programmed for construction" in the County's capital improvements plan, the requirement would not comport with common sense. As evidenced in the AOF Part, on-site facilities of a non-capital program nature traditionally are provided by the developer and typically are not constructed until the time of actual development. *See* County Code, Art. 26, § 2–414(c)(2) (providing, as an alternative, that a "proposed subdivision shall be considered to be adequately served by fire suppression facilities" if "the subdivider will install a sufficient number of 5,000 gallon capacity underground water storage tanks so that no structure in the subdivision will be located more than 2,000 feet from a tank . . . ."); County Code, Art. 26, § 2–417(d) (mandating that a "private community sewerage system shall be considered adequate if the design is authorized and approved by appropriate State and County authorities in accordance with" the operational adequacy requirements of the sewerage section); County Code, Art. 26, § 2–418(b)(1) (explaining that a "storm drainage system shall be considered adequate" if "the on-site drainage system installed by the subdivider will be capable of conveying through and from the property the design flow of stormwater originating in the

subdivision" and various flows from upstream); County Code, Art. 26, § 2–419(d) (providing that a "private community water supply system shall be considered adequate if the design and installation of the system is authorized and approved by appropriate State and County authorities in accordance with" the operational adequacy requirements of the water section); County Code, Art. 26, § 2–419(e) (mandating that "individual water supply systems or multiuse water supply systems shall be considered adequate if the design and installation of the system is authorized and approved by appropriate State and County authorities"). Pursuant to the maxim that a "statute be given a reasonable interpretation, not one that is illogical or incompatible with common sense," *State v. Brantner*, 360 Md. 314, 321, 758 A.2d 84, 88–89 (2000) (citing *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985); *Erwin and Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985)), there is no apparent reason to discount these principles at rezoning. In particular, we see no logical basis for requiring, before a rezoning may be approved, that the County agree to provide on-site facilities of a non-capital program nature, when responsibility for those facilities, by their nature, lies with the developer.[22] Likewise, it also defies reason to require that on-site facilities of a non-capital program nature be programmed for construction at rezoning when, at that time, the property and those facilities can be contemplated only at a conceptual level.

 Therefore, "approach[ing] the analysis of the language from a 'commonsensical,' rather than a technical perspective," *Richmond v. State*, 326 Md. 257, 262, 604 A.2d 483, 486 (1992) (quoting *United States v. Universal Corp.*, 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952)), the "in existence or

---

**22.** In fact, Anne Arundel County, in its brief, recognizes the distinction between on-site and off-site facilities and argues that, for purposes of § 2–105(a)(3), "[i]f *offsite* roads, schools, water, sewer and storm water management are adequate to support the [proposed zoning], facilities are adequate." (Emphasis added).

programmed for construction" requirements of § 2–105(a)(3) cannot be applied to on-site facilities of a non-capital program nature. On-site facilities of a non-capital program nature must comport, at the time of zoning, and at least at a conceptual level, with the operational adequacy requirements enumerated in the relevant section of the AOF Part, leaving to the later stages of the development and permitting processes the implementation of specific developer responsibility for their construction.[23] With regard to publicly owned off-site facilities, however, an applicant must prove, despite the acceptable levels of commitment permitted at subdivision, that facilities meeting the operational adequacy requirements of the relevant AOF section are either in existence or programmed for construction in the County's capital improvements program or the current State consolidated transportation program.[24] For instance, as applied to storm drainage

---

23. Any on-site facilities of a capital program nature, in all likelihood, would be identified on a County or State plan and, by definition included (or need to be included) in the appropriate capital program. Any developer responsibility for participation in bringing such a facility to fruition would be addressed in the post-zoning development and permitting stages of the relevant County or State processes.

24. Although the issue is unlikely to arise in practice, a distinction between publicly owned and privately owned off-site facilities is necessary here. As defined in § 2–409 of the AOF Part, a "community sewerage system" is "a system, whether publicly or privately owned, serving two or more individual lots for the collection and disposal of sewage or industrial wastes of a liquid nature, including various devices for the treatment of the sewage and industrial wastes." County Code, Art. 26, § 2–409(e). Similarly, a "community water supply system" is "a source of water and a distribution system, including treatment facilities and storage facilities, whether publicly or privately owned, serving two or more individual lots." County Code, Art. 26, § 2–409(f). Pursuant to these definitions, an off-site sewerage or water supply system may be privately owned, which, by its terms, normally removes it from being programmed for construction in the County's capital improvements program. Presumably, if such a circumstance arose in the context of a zoning reclassification, the facility would be treated as an on-site facility for purposes of § 2–105(a)(3). That is, the applicant would retain the burden of demonstrating that the privately owned community water or sewerage systems, and by extension, fire suppression facilities (which may be served by "an approved community water

systems, this interpretation requires an applicant to demonstrate, as at subdivision, that on-site storm drainage systems would be capable of meeting the operational adequacy requirements applicable to them (*see* County Code, Art. 26, § 2-418(b)(1) ("A storm drainage system shall be considered adequate if ... the on-site drainage system installed by the subdivider will be capable of ....")), but, contrary to the acceptable levels of commitment at subdivision, to demonstrate that adequate off-site storm drainage systems are either in existence or programmed for construction in the County's capital improvements program.[25]

■ Turning to the facts of this case, the findings and conclusions of the Board reveal that the Board erroneously interpreted the requirements of § 2-105(a)(3) in rendering its findings regarding some of the facilities and, for at least two types of facilities, failed to make any findings regarding their adequacy. In particular, in its consideration of the adequacy of roads, the Board erroneously relied upon *Montgomery County v. Greater Colesville Ass'n, Inc.*, 70 Md.App. 374, 521 A.2d 770 (1987), and concluded that transportation facilities met the requirements of § 2-105(a)(3) because the "accomplishment of the proposed traffic improvements [wa]s reasonably probable of fruition." *See Greater Colesville*, 70 Md.App. at 387, 521 A.2d at 777 ("[I]n a typical zoning case involving the issue of the adequacy of the existing traffic system ... all that is required is that the proposed improvements be reasonably probable of fruition in the foreseeable future."). The local statutory scheme considered in *Greater Colesville* is not analogous to that presented in the case before us. In like

system") (*see* County Code, Art. 26, § 2-414(c)(1)), would be capable of meeting the operational adequacy requirements applicable to them.

**25.** In its unpublished opinion, the Court of Special Appeals adopted this interpretation in its consideration of storm drainage systems. According to the intermediate court, "any off-site requirements of [County Code, Art. 26, § ] 2-418(b)(2) [ (the storm drainage section of the AOF Part) ] must be in existence or programmed for construction prior to any rezoning, and the developer must prove that an on-site system would be capable of meeting the requirements of § 2-418(b)(1)."

manner, the Board also noted that "improvements to transportation facilities w[ould] be required prior to approval of any subdivision of th[e] Property." Pursuant to language of § 2–105(a)(3), however, the Board was required to find that adequate access roads, as defined in County Code, Art. 26, § 2–415(a)(1), were either in existence or programmed for construction. By its own terms, therefore, § 2–105(a)(3) excludes from consideration at zoning as an acceptable level of commitment facilities that are characterized merely as "reasonably probable of fruition" and/or those the provision of which at the time of subdivision may be proffered by the developer.

In recognition of " 'the fundamental right of a party to be apprised of the facts relied upon by [an administrative] agency,' " *Bucktail, L.L.C. v. Talbot County,* 352 Md. 530, 554, 723 A.2d 440, 451 (1999) (quoting *Baker v. Bd. of Trustees,* 269 Md. 740, 747, 309 A.2d 768, 772 (1973)), our review of the Board's findings and conclusions also takes into consideration the principle that findings of fact by an administrative agency "must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Bucktail,* 352 Md. at 553, 723 A.2d at 451 (citing *Turner v. Hammond,* 270 Md. 41, 55 56, 310 A.2d 543, 551 (1973)); *Rodriguez v. Prince George's County,* 79 Md.App. 537, 550, 558 A.2d 742, 748 (1989) ("It is not permissible for the Council, or any administrative body, simply to parrot general statutory requirements or rest on broad conclusory statements."); *Ocean Hideaway Condominium Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 662, 515 A.2d 485, 490–91 (1986)). *See also Aaron v. City of Balt.,* 207 Md. 401, 406, 114 A.2d 639, 640 (1955) ("It is arbitrary and unlawful for [an administrative agency] to make an essential finding without supporting evidence."). In this case, it appears that the Board simply adopted, as positive fact, the negative declaration of a County employee, Mr. Kevin Dooley, that "there were no issues related to the adequacy of public facilities except for transportation systems." Therefore, although the Board found "persuasive" the testimony of Petitioner's expert engineer that "the water, sewerage and storm drainage systems" would "be

adequate to serve the uses permitted within the C3 zone," the Board erred in rendering no affirmative findings regarding the question (or in failing to explain the irrelevancy of such an inquiry on the facts before it) whether adequate off-site water, sewerage, and storm drainage systems were either in existence or programmed for construction in the County's capital improvements plan.

In addition, the Board omitted any mention of fire suppression facilities from its decision on Petitioner's application for rezoning. As provided in County Code, Art. 26, § 2–414(c)(1), a proposed subdivision "shall be considered to be adequately served by fire suppression facilities" if:

(1) it will be served at the time of issuance of the first occupancy permit by an approved community water supply system or multiuse water supply system capable of providing fire-flow in accordance with rates of flow specified in the County Ten Year Master Plan for water and Sewer for that type of development; or

(2) it will be provided a fire protection water supply in the following manner: .

(i) the subdivider will install a sufficient number of 5,000–gallon capacity underground water storage tanks so that no structure in the subdivision will be located more than 2,000 feet from a tank, as measured along approved accessible roadways in the subdivision, with the construction and installation of all tanks approved by the Fire Department; or

(ii) the subdivider will utilize a source of fire protection water supply approved by the Fire Department.

Petitioner maintains that because "[u]ndisputed testimony before the Board established that public water was available and adequate to serve the Property," there was "a sufficient basis for the Board to conclude that fire suppression facilities were adequate to serve the uses proposed by the C3 zoning classification." Even assuming the existence of an approved community water supply system, however, § 2–105(a)(3) explicitly requires that the Board make "an *affirmative* finding" regarding the adequacy of fire suppression facilities. (Emphasis

added). Pursuant to that mandate, for example, the relationship of the existence of an approved community water supply system to the adequacy of fire suppression facilities should be made meaningfully explicit in the Board's decision. In the absence of that, we are unable to conclude that there was substantial evidence to support the Board's finding regarding the adequacy of those facilities. *See Dep't of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 112 n. 1, 771 A.2d 1051, 1053 n. 1 (2001) ("We have said time and time again, that we will review an adjudicatory agency decision solely on the grounds relied upon by the agency.") (citations omitted); *United Steelworkers of America AFL–CIO, Local # 2610 v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984) ("[I]n judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.").

 Likewise, the Board also failed to address the adequacy of schools. The "Schools" section of the AOF Part provides:

(a) This section does not apply to:

(1) a proposed subdivision to be developed exclusively for nonresidential uses; or

(2) a proposed subdivision to be developed according to federal regulations restricting occupancy in the dwelling units to elderly persons.

(b) Within two years following approval of a final subdivision plat, elementary and secondary schools in the service area of the proposed subdivision shall be adequate to accommodate the school population projected to be generated from the proposed subdivision.

(c) Elementary and secondary schools in the service area of the proposed subdivision shall be considered adequate if:

(1) the school population projected to be generated from the proposed subdivision may be enrolled at schools located in the service area at which the enrollment does not exceed the State Interagency Committee school capacity guidelines

as specified in the administrative procedures guide of the public school construction program, or

(2) the County Board of Education determines that the enrollment of the additional students expected to be generated from the proposed subdivision would not be detrimental to the quality of the curriculum and programs being offered at the schools, at schools in which the enrollment exceeds the State Interagency Committee school capacity guidelines.

County Code, Art. 26, § 2–416. According to Petitioner, the Board was not required to render an affirmative finding regarding the adequacy of schools because the "Schools" section of the AOF Part, by its own terms, precludes from its requirements "a proposed subdivision to be developed exclusively for nonresidential uses." County Code, Art. 26, § 2–416(a)(1). Pursuant to § 2–105(a)(3), however, facilities must be "adequate to serve the uses *allowed* by the new zoning classification." (Emphasis added). Relevant here, both apartments and townhouses are permitted as conditional uses in a C3 district. *See* County Code, Art. 28, § 3–303(b)(1), (5). Thus, even were it required or inclined to disregard Petitioner's announced intentions for the Property (which, in fact, included residential uses [26]), the Board was required to make an affirmative finding that adequate schools were either in existence or programmed for construction in the County's capital improvements program, or explain why that inquiry was unnecessary on the record before it.

Due to the Board's erroneous interpretation and application § 2–105(a)(3), we affirm the judgments of the Court of Special Appeals and the Circuit Court. Generally, "when an administrative agency utilizes an erroneous standard and some evidence exists, however minimal, that could be

---

**26.** Mr. Robert Agee, a partner in Annapolis Developers (Petitioner), testified that "[t]he mixed uses that [they] contend[ed] for the site [we]re commercial, office, and residential." Although the Code did not require Petitioner to adduce such testimony, that it did does not mean necessarily it should be ignored in the analysis of its application.

considered appropriately under the correct standard, the case should be remanded so the agency can reconsider the evidence using the correct standard." *Belvoir Farms Homeowners Assoc., Inc. v. North,* 355 Md. 259, 270, 734 A.2d 227, 234 (1999). In this case, however, Petitioner's failure to meet its evidentiary burdens precludes such an action. Specifically, although Petitioner offered general evidence regarding the adequacy of water systems,[27] it is not apparent on this record that the testimony was intended also to address the adequacy of fire suppression facilities. *See supra* pages 32–33. Likewise, as the Court of Special Appeals explained, although Petitioner's assertion that "there would be no need for an off-site [storm drainage] system" is "implied by" the testimony of Petitioner's expert engineer, those facts were not "clearly established in the record." Even assuming, however, that Petitioner's testimony or other evidence was sufficient for purposes of enabling the Board to make affirmative findings as to fire suppression facilities and off-site storm drainage systems, Petitioner failed to present, as the Chairman of the Board noted in his dissent, "one scintilla of evidence that indicate[d] that schools [we]re adequate to serve the development of th[e] [P]roperty with apartments as proposed by the Petitioner." Because Petitioner bore and failed to meet the "burden of proof, including the burden of going forward with the evidence and the burden of persuasion," in this matter (County Code, Art. 28, § 11–102(b)), we do not remand this particular case for further consideration by the Board.[28]

---

27. Before the Board, Petitioner's expert witness, Mr. Schuman, testified that there was "a 12 inch water line out in Bestgate Road that will serve the site." According to Mr. Schuman, "[w]ater [wa]s available and adequate."

28. Pursuant to County Code, Art. 28, § 11–105(a),

[a]fter an application has been acted on by the Administrative Hearing Officer, the same property may not be considered for substantially the same rezoning, critical area reclassification, special exception, or variance, or for a less restrictive critical area reclassification or rezoning, within 18 months after the date of denial by the Administrative Hearing Officer, the County Board of Appeals, or a court, whichever is the latest.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*