827 A.2d 927

K.W. James ROCHOW, et al.

v.

MARYLAND NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, et al.

No. 0744, Sept. Term, 2002.

Court of Special Appeals of Maryland.

June 27, 2003.

562

Michael C. Worsham, Forest Hill, for appellants.

M. Andree Green (Adrian R. Gardner, General Counsel, George R.H. Johnson, on brief, for appellee MNCPPC), Upper Marlboro, Bruce L. Marcus (Marcus & Bonsib, Greenbelt, Andre J. Gingles, Robert D. Lourie, O'Malley, Miles, Nylen & Gilmore, P.A., Beltsville, for Peterson Companies, L.C.), for appellees.

Argued before EYLER, JAMES R., ADKINS, BLOOM, THEODORE G., (Retired, Specially Assigned) JJ.

ADKINS, J.

We are asked to vacate the approval of a preliminary subdivision plan for "National Harbor," an ambitious proposal to build an "urban destination resort" along the shores of the Potomac River. We shall do so because (1) the plan generates traffic that exceeds a limit on development that the Prince George's County District Council imposed as conditions on the zoning map amendment and the conceptual site plan for this unique site, and (2) the developer did not submit required data regarding the noise impact of the project on neighboring residential communities.

## FACTS AND LEGAL PROCEEDINGS

### Zoning Map Amendment And Conditions

Since the mid–1960's, developers and Prince George's County planners have explored prospects for building a waterfront complex along the Potomac River, at the foot of the Woodrow Wilson Bridge at Smoot Bay. *See Egloff v. Dist. Council of*

*Prince George's County,* 130 Md.App. 113, 118–19, 744 A.2d 1083 (2000). In 1983, a development proposal called "Bay of Americas" envisioned a mixed use project encompassing retail, hotel, and residential uses. *See id.* at 119, 744 A.2d 1083.

With hopes of duplicating some of Baltimore's development successes at its Inner Harbor, the Prince George's County Council, sitting as the District Council (the "District Council"),[1] enacted a 1983 zoning map amendment.[2] As a condition of that rezoning, the District Council required prospective developers to submit a "comprehensive concept plan" showing certain details of the proposed development concept. It also required the Planning Board to require, "as a condition of its final approval of the comprehensive concept plan," that the District Council must review and approve that plan.

In 1988, the District Council responded to a successor proposal to develop the site as "PortAmerica." *See id.* The Council modified some of the conditions that it had attached to the 1983 zoning map amendment, but retained the condition requiring the Prince George's County Planning Board (the "Planning Board")[3] to refer any comprehensive concept plan

---

**1.** The District Council "may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate, in the portion of the regional district lying within its county, . . . . the location and uses of buildings . . . for trade, industry, residence . . . and . . . the uses of land" for such purposes. Md.Code (1957, 1997 Repl.Vol., 2002 Cum.Supp.), Art. 28 § 8–101(b)(2).

**2.** The site includes three zoning classifications: M–X–T (mixed use transportation)(floating zone), R–R (rural residential)(Euclidean zone based on district and use), and R–M (residential medium development)(floating zone). Adjacent residential properties to the south and northeast are zoned R–R. Property to the south and southeast is undeveloped and zoned R–R. Residential homes in Oxon Hill lie between the two parcels.

**3.** Under the "Maryland–Washington Regional District Act," "[n]o plat of any subdivision of land within the regional district shall be admitted to the land records of . . . Prince George's County . . . until the plat has been submitted to and approved by the [Maryland National Capital Park and Planning Commission] ('MNCPPC')". *See* Art. 28 § 7–103, § 7–104, § 7–115(a)(1). Members of the MNCPPC appointed by the

for developing this property to the District Council for its review and approval.

## National Harbor

During the ensuing years, PortAmerica died on the development grapevine. Ten years after the District Council last rezoned the site, in 1998, The Peterson Companies, L.C. ("Peterson") offered a conceptual site plan for National Harbor. Peterson asked for permission to proceed with building plans for a 469 acre "Waterfront Parcel" along the Potomac[4] and on a non-contiguous 64.7 acre "Beltway Parcel" situated next to the Capital Beltway, the Woodrow Wilson Bridge, and Oxon Hill Road.[5]

---

Prince George's County Council comprise the Prince George's County Planning Board. *See* Art. 28 § 7–111(a). When a proposed subdivision is located entirely within Prince George's County portion of the district, that proposal is reviewed and approved solely by the Planning Board. *See id.* In exercising those powers, the Planning Board "may prepare regulations and amendments governing the subdivision of land within ... the respective portions of the regional district within ... Prince George's County." Art. 28 § 7–116(a). Legislative review of such proposals is conducted by the Prince George's County Council, sitting as a District Council. *See* § 8–101(a).

Because the Planning Board approved the preliminary subdivision plan on behalf of the MNCPPC, we shall refer to appellee MNCPPC as the Planning Board or Board.

4. The Waterfront Parcel plan features dining, hotel, 24 hour entertainment, and retail uses. Its 469 acres include 241 acres underneath the waters of Smoot Bay, and 228 acres of land along 1.25 miles of Potomac River shoreline. Res. for SP 98012 at 1. The parcel is divided into five zones: Zone A is The Point; Zone B is the Central Waterfront and includes a "speed parking garage" with approximately 8,000 spaces; Zone C is North Cove with the main entrance to National Harbor; Zone D is The Pier, featuring "classic recreation," retail, dining, and entertainment; and Zone E is the Upland Resorts, featuring 1,500 hotel rooms on wooded property east of the Central Waterfront.

5. The Beltway Parcel consists of 64.7 acres north and east of the Waterfront Parcel. This parcel lies directly south of the Capital Beltway. Across the Beltway to the north is the Oxon Hill Children's Farm, which is part of the National Park Service. Immediately south of the parcel is the Oxon Hill Manor residential neighborhood and Betty Blume Park.

The Board, and then the District Council, approved Peterson's conceptual site plan (the "CSP"). Both treated Peterson's CSP as the "comprehensive concept plan" that was required by the 1983 and 1988 zoning map amendments. In doing so, both also conditioned their approval of the CSP by listing certain requirements that had to be satisfied at various stages of development.

One of these conditions addressed the concern of planners and residents that the bridge, Beltway, and local roads could not handle unlimited new development. To ensure traffic adequacy, the Planning Board and District Council restricted development of the Beltway Parcel to the 200,000 square feet of office space and 725,000 square feet of retail space that had been proposed in the CSP, or alternatively, to any use configuration that generated 1,226 or fewer "peak hour trips" in the morning (the "AM trip cap"), and 2,565 peak hour trips in the afternoon. These "trip caps" reflected levels of traffic that, according to Peterson's 1998 traffic study, would be generated by its Beltway Parcel proposal.

Three years later, in May 2001, Peterson asked the Board to approve the next stage of the National Harbor project—a preliminary subdivision plan (the "PSP").[6] But Peterson's PSP differed from the CSP that the District Council approved in 1998. There was a significant change in the Beltway Parcel. Instead of a predominantly retail development of 725,000 square feet, with only 200,000 square feet of office space, the revised plan called for 1.22 million square feet of office space with only 200,000 square feet of retail space.

---

**6.** Under section 27–270(a) of the Prince George's County Code,

[w]hen a Conceptual Site Plan or Detailed Site Plan is required, ... the following order of approvals shall be observed:

 (1) Zoning;
 (2) Conceptual Site Plan;
 (3) Preliminary Plat of Subdivision;
 (4) Detailed Site Plan;
 (5) Final Plat of Subdivision ...;
 (6) Grading, building, use and occupancy permits.

For consistency, we shall refer to the preliminary plat of subdivision as a "preliminary subdivision plan" or "PSP."

In support of its PSP, Peterson submitted a new traffic study. Engineers in the Transportation Planning section of the Maryland National Capital Park and Planning Commission ("MNCPPC") reviewed the PSP and the traffic study. In addition to questioning the methodology used in Peterson's new study, transportation engineers also quickly pointed out the obvious—that Peterson's reconfigured subdivision plan for the Beltway Parcel "raised a trip cap issue."

What the traffic study conclusively showed was that the PSP exceeded the alternative square footage and the AM traffic cap conditions imposed by both the Planning Board and the District Council. Using Prince George's County trip rates that "more accurately reflect the estimated number of trips within the County," MNCPPC engineers concluded that "[t]he proposed new land uses, compared to the approved Conceptual Site Plan, would generate an additional 1,872 . . . peak hour trips during the morning[.]" Even using Peterson's more favorable trip rates, however, the PSP still "exceed[ed] the conceptual plan cap by 1,476 trips." [7]

MNCPPC engineers interpreted the trip cap as a "traffic adequacy" ceiling on developing the Beltway Parcel. In the staff's view, the Planning Board could not finally approve Peterson's PSP without impermissibly ignoring or revising an explicit condition that the District Council imposed in the exercise of the review and approval authority that it reserved in condition 3 to the 1988 zoning map amendment. The staff reasoned that the AM trip cap, because it was "imposed at the

---

[7]. The reconfigured plan did not exceed the PM trip cap if it was predicated on Peterson's data and methodology. Using the methodology preferred by the MNCPPC staff, it exceeded the 2,565 PM trip cap by 1,251 trips. We do not address the analytically separate issue of whether the Planning Board erred in approving a plan that also violated the PM trip cap, because the protestants have only criticized, rather than directly challenged, the Board's decision to reject the trip rate methodology approved by MNCCPC staff in favor of the methodology used in Peterson's traffic study. Thus, we do not decide whether the Planning Board erred in predicating its approval of the National Harbor PSP on data that does not conform to the "Guidelines for the Analysis of the Traffic Impact of Development Proposals."

time of an earlier [traffic] adequacy study which was reviewed and affirmed by the District Council[,] would not be subject to revision unless the subsequent cap were also subject to review by the District Council."

In response, Peterson attempted to persuade MNCPPC staff that this trip cap should not be literally construed or strictly enforced. Because the purpose of the trip caps was to ensure traffic adequacy, it reasoned, the District Council intended the trip caps to be, in effect, a merely directory benchmark meaning that there had to be adequate transportation facilities for the Beltway Parcel. Peterson posited that, even though the PSP exceeded the AM trip cap, nevertheless, it could "substantially conform" to the approved CSP if adequate traffic facilities existed for the reconfigured plan. Citing its new 2001 traffic study, Peterson claimed that the existing and planned roads were adequate for the additional traffic generated by the increase in office space.

The Board proceeded with a scheduled public hearing on the National Harbor PSP. At that hearing, the MNCPPC staff member with responsibility for development review rejected Peterson's "intent" and "substantial conformance" argument. Instead, he affirmed the staff's written opinion that Peterson and the Planning Board would have to ask the District Council either to review the PSP or revise the CSP, because the Board could not unilaterally approve a plan that violated the Council's trip cap. The development review director concluded that the PSP would "substantially conform" to the approved CSP only if the Beltway Parcel had 443,000 square feet or less of office space, which would bring it within the AM trip cap. The Planning Board rejected the MNCPPC staff's interpretation of the trip caps. Instead, it adopted Peterson's reasoning. The Board concluded that the PSP was in "substantial conformance" with the CSP approved by the District Council because the District Council's intent in imposing the trip caps was merely to ensure traffic adequacy and Peterson's new traffic study established that "adequate transportation facilities would exist to serve the proposed subdivision[.]"

### Judicial Review

Oxen Hill residents K.W. James Rochow, Tonya Pometto, Bonnie Bick, and Cassandra Egloff (the "protestants") petitioned the Circuit Court for Prince George's County to review the Planning Board's decision. Concurring with the "intent" and the "substantial conformance" rationales for disregarding the AM trip cap, the court affirmed the Planning Board's decision.

The protestants noted this timely appeal, in which MNCPPC and Peterson are appellees. They renew their challenge to the Planning Board's interpretation of the AM trip cap and point to several other conditions that the PSP allegedly failed to satisfy. They raise four issues, which we have rephrased:

I.　Did the Planning Board err in approving the National Harbor preliminary subdivision plan even though the reconfigured Beltway Parcel violated the District Council condition prohibiting development that generates more than 1,226 AM peak hour trips?

II.　Did the Planning Board err in approving the preliminary subdivision plan without requiring additional noise study?

III.　Did the Planning Board err in approving the preliminary subdivision plan without requiring Peterson to satisfy many of the conditions that the District Council imposed?

IV.　Did the Planning Board err in approving the preliminary subdivision plan without issuing sufficient written findings of fact and conclusions of law?

We agree with the protestants that the Planning Board could not disregard the AM trip cap because it resulted from a condition on a zoning map amendment that remained mandatory and binding under the District Council's resolution approving the conceptual site plan. For the reasons articulated by the MNCPPC staff, this trip cap limits development of the Beltway Parcel; it is a ceiling that only the District Council itself can raise. The Planning Board approved a PSP that

violates this zoning condition. We therefore reverse the circuit court's decision affirming approval of the National Harbor PSP, and remand for additional administrative proceedings.

Because the remaining issues relate to other conditions imposed by the District Council, we shall address those issues as well. We conclude that the Planning Board erred in approving the PSP without requiring Peterson to submit additional data so that the Board could determine whether the anticipated noise generated by National Harbor's entertainment venues and speed parking garage violates state noise exposure regulations, and without addressing whether Peterson submitted the water quality and engineering studies that the District Council required.

## DISCUSSION

### Rezoning Conditions In Prince George's County

When, as in this case, a proposed subdivision is located entirely within the Prince George's County portion of the regional district covered by the "Maryland–Washington Regional District Act," those subdivision plans must be reviewed and approved by the Prince George's County Planning Board. *See* Md.Code (1957, 1997 Repl.Vol., 2002 Cum.Supp.), Art. 28 § 7–111.[8] Under that act, Planning Board approval is a requirement for recording a subdivision plan. *See* § 7–115(a)(1).

Changing the zoning classification of property within the Prince George's district, however, is a legislative action reserved for the Prince George's County Council, sitting as a District Council. *See* § 8–101(a). The District Council may enact legislation that imposes "standards and requirements for the purpose of avoiding the scattered or premature subdivision or development of land because of the inadequacy of transportation, water, sewerage, drainage, ... or other public facilities." § 7–120. The District Council also may "adopt and amend the text of the zoning ordinance" by ordinance. § 8–101(b)(2). Similarly, for land located within the district, the

---

**8.** All following citations to are to Article 28 unless otherwise noted.

Council "may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate ... the location and uses of buildings ... for trade, industry, residence, recreation, agriculture, public activities, and other purposes[.]" *Id.*

Among the District Council's statutory zoning powers is the power to impose conditions when it changes the zoning classification of mapped property within the regional district.

> In approving any local [zoning] map amendment ..., the district council ... may ... adopt whatever reasonable ... conditions as may in its opinion be necessary either to protect the surrounding properties from adverse effects which might accrue from the zoning amendment, or which would further enhance the coordinated, harmonious, and systematic development of the regional district.

§ 8–104(e). *See also* Prince George's County Code ("PG Code") § 27–213(c)(1) ("When it approves a Zoning Map Amendment, the District Council may impose reasonable requirements and safeguards (in the form of conditions) which it finds are necessary to either ... [p]rotect surrounding properties from adverse effects which might accrue from the Zoning Map Amendment; or ... [f]urther enhance the coordinated, harmonious, and systematic development of the Regional District").

When the District Council exercises its authority to create a condition to a zoning map amendment, the condition becomes an integral part of its action.

> **A statement of these conditions** [on a zoning map amendment] shall be included in the resolution granting the amendment and shall become a part thereof, and **remain in effect for so long as the property remains zoned in accordance with the resolution** and applicable zoning classification requested.

§ 8–104(e). Thus, "[c]onditions imposed by the District Council ... become a permanent part of the Zoning Map Amendment, and shall be binding for as long as the Mixed Use Zone remains in effect on the property (unless amended by the Council)." PG Code § 27–213(c)(4).

All subdivision plans for such sites that have been rezoned with conditions must comply with the conditions imposed on the zoning map amendment. "All conditions imposed shall be mandatory." PG Code § 27–213(d)(1). Consequently, "[n]o . . . subdivision plat may be issued or approved for the property except in accordance with conditions set forth in the resolution" adopting the zoning map amendment. § 8–104(e). Moreover, "[t]he failure to comply with any condition shall constitute a zoning violation and shall be grounds for the Council to . . . [i]nstitute any . . . action necessary to obtain compliance." PG Code § 27–213(d)(1).

Another zoning power of the District Council is the power to enact standards for major subdivisions, and procedures for their application, review, and approval. *See* PG Code subtitle 24. The District Council has exercised this power by (1) authorizing the Board to impose conditions on its approval of subdivision plans,[9] and (2) requiring it to determine whether there are adequate roads prior to approving a preliminary subdivision plan.[10]

### Summary Of Conditions

For clarity and economy, we present relevant conditions that were imposed by the Planning Board and the District Council in the following summary timeline.

---

**9.** *See* PG Code § 24–110 (permitting Planning Board to attach "reasonable conditions" to plan approval); PG Code § 24–119 (developer must submit preliminary subdivision plan to Planning Board); PG Code § 27–276(a)(1) (Planning Board approval of conceptual site plan required "[p]rior to approval of any preliminary plan of subdivision or Detailed Site Plan . . . for which a Conceptual Site Plan is required").

**10.** *See* PG Code § 24.122.01 ("Planning Board may not approve a subdivision plat if it finds that adequate public facilities do not exist . . . as defined in . . . 'Guidelines for the Analysis of the Traffic Impact of Development Proposals' "); PG Code § 24.124 ("Before any preliminary plat may be approved, the Planning Board shall find that" access roads are adequate and "traffic generated by the proposed subdivision will be accommodated on major intersections and major roadways within the established study area such that they will be functioning below the minimum peak-hour service levels adopted by the Planning Board in the 'Guidelines for the Analysis of the Traffic Impact of Development Proposals' ").

1983 District Council amended zoning map to permit M–X–T development, in connection with "Bay of Americas" proposal, with specific conditions.

9.26.88 District Council granted petition by PortAmerica developers to modify conditions attached to the 1983 zoning map amendment. Modified conditions included the following:

Condition 1: "All areas zoned M–X–T in this case shall be included on a comprehensive concept plan[.]"

**Condition 3: "As a condition to its final approval of the comprehensive concept plan, the Planning Board shall require review and approval of that plan by the District Council."**

Condition 7: "The comprehensive concept plan shall include a staging plan. **This staging plan** shall show each separate stage of development of all of the properties being rezoned M–X–T ... and **shall demonstrate that there are or will be adequate transportation facilities for each stage of development. The staging plan shall also include a market analysis demonstrating the economic feasibility of each development stage."**

Condition 8: "In order that ultimate development of the subject property and the properties in the companion M–X–T cases will be of the 'exceptionally high quality' referred to in Council Resolution 57–1981, ... the comprehensive concept plan and final plan of development submitted to the Planning Board shall....

b. Compare the scale of the relationship of the proposed development with that of existing residential development in the vicinity, in terms of height, mass, density, and similar factors;

c. Demonstrate the orientation of buildings, including loading areas and mechanical equipment, to adjacent residential areas; ...

e. Show a cohesive architectural theme for all development .... a theme incorporating building design and materials, signs, street furniture, and landscaping, so

that the Planning Board may make a finding that the architectural design of the entire development is unified and of high quality. . . ."

Condition 9: "Prior to approval of any stage of the applicants' proposal, the Planning Board shall determine which alternate transportation improvements or systems are necessary to maintain acceptable levels of service at critical intersections and interchanges in the property's vicinity for that stage of development. No development beyond the applicants' initial development stage shall be permitted until such alternate transportation systems are under construction."

**Condition 13: "The comprehensive concept plan shall include a noise study demonstrating** the cumulative noise from aircraft operations at National Airport and traffic on the Capital Beltway. This noise study shall include **a map over the concept plan illustrating** noise contours over 65 decibels, proposed noise attenuation measures, and **the anticipated effects of noise from the proposed development on adjoining residential areas."**

**Condition 14: "The comprehensive concept plan shall include a water quality study which addresses [enumerated matters]."**

**2.13.98** Peterson filed a conceptual site plan for National Harbor (CSP–98012). Proposal for Beltway Parcel was for "prestigious hospitality location with a major upscale retail and business address on the Capital Beltway," featuring 725,000 sq. ft. retail, 200,000 sq. ft. office space, 1,000 hotel rooms, and 50,000 sq. ft. visitors center. Supporting traffic study showed traffic adequacy at 1,226 AM peak hour trips.

**4.13.98** Technical staff of MNCPPC issued a comprehensive detailed report recommending approval of the CSP, with a condition limiting development of the Beltway Parcel to the proposed use configuration, or alternatively, to the peak hour trips shown in the traffic study.

**4.23.98** Public hearing and Planning Board approval of CSP, with conditions and supporting findings of fact, including:

**Condition 1:** "Total development within the Beltway Parcel ... shall be limited to ... 200,000 square feet of general office space.... **Alternatively, different permitted uses generating no more than the number of peak hour trips (1,226 AM peak hour trips and 2,565 PM peak hour trips) generated by the above development may be allowed.**"

**Condition 35: "The District Council shall review and approve a Conceptual Site Plan for National Harbor."**

**6.10.98** By order, District Council approved CSP–98012, with 39 conditions, including the following:

**Condition 1:** "Total development within the Beltway Parcel of the subject property shall be limited to the following:

 a. 725,000 square feet of retail space

 b. 200,000 square feet of general office space

 c. 1,000 hotel rooms

 d. A visitors center

**Alternatively, different permitted uses generating no more than the number of peak hour trips (1,226 AM peak hour trips** and 2,565 PM peak hour trips) **generated by the above development may be allowed.**"

Condition 8: "The applicant shall be required to submit a limited Detailed Site Plan for the proposed speed-parking garage located within the Waterfront Parcel.... As a part of Detailed Site Plan approval, a noise study shall be submitted to the Natural Resources Division demonstrating that adequate noise abatement measures have been taken to reduce noise levels to 65 dBA Ldn at the property lines of residential lots. Noise generated by car alarms shall be included in this noise study."

**Condition 18: "Prior to certificate approval of the Conceptual Site Plan, the applicant shall submit for review and approval by the Department of Environmental Resources, engineering studies to indicate**

techniques for constructing proposed pilings or other over-water development."

**Condition 35:** "Compliance with State noise regulations shall be determined with regards to sound generated by National Airport, the Capital Beltway and the subject property prior to approval of the Preliminary Plat of Subdivision."

**11.23.98** Circuit court affirmed District Council's approval of the CSP, except with respect to condition 13 of the 1988 zoning map amendment, requiring a noise study. 1988 noise study for PortAmerica did not adequately address noise concerns raised by National Harbor proposal. Remanded to District Council for "presentation of a proper noise study" and findings regarding "the impact of the proposed uses on the adjoining residential areas as required by Condition 13[.]"

**2.1.00** Court of Special Appeals vacated circuit court judgment because named petitioner was not a Prince George's County resident and other petitioners did not join petition for judicial review or file their own. *See Egloff,* 130 Md.App. at 134, 744 A.2d 1083.

**5.31.01** Peterson applied to Planning Board for approval of preliminary subdivision plan, and filed New National Harbor Traffic Impact Study. PSP4–01048.

**6.29.01** Engineering staff of Transportation Planning Section of the MNCPPC submitted review of Peterson's new traffic study, noting that "[t]he land uses and trip rates for the Beltway Parcel changed significantly, causing an increase in the number of trips generated by the Beltway Parcel beyond those approved by the [District Council] resolution." Staff concluded that Peterson's traffic study was not an adequate basis for determining transportation adequacy, for several reasons:

● Peterson's traffic study used "ITE" (Institute of Transportation Engineers) trip rates, but "should have utilized the Prince George's County trip rates, which more accurately reflect the estimated number of trips within the County."

- "ITE trip generation rates utilized in the study were used incorrectly, thereby understating the number of trips that the proposed site should generate."
- Peterson study did not separately calculate trip generation from each separate office building, then add them up, which is preferred method "when the individual buildings are isolated and not related to one another[.]"
- Only three of the 215 case studies used as comparisons featured a floor area above one million square feet.
- Using the PG trip rates, "[t]he proposed new land uses, compared to the approved Conceptual Site Plan, would generate an additional 1,872 and 1,251 peak hour trips during the morning and evening peak hour respectively."

7.26.01 Planning Board issued Technical Staff Report (E173–90) reflecting recommendations of MNCPPC's Planning, Transportation, and Environmental Planning sections, recommending approval of the PSP with conditions, including a condition that the office/retail/hotel room space proposal for the Beltway Parcel be reduced from 1,220,000 sq. ft. of office space to 443,000 sq. ft., in order to satisfy the 1,226 AM peak hour trip cap.

Public hearing before Planning Board regarding National Harbor PSP. Transportation Staff agreed that PSP was in substantial compliance with CSP only if the Beltway Parcel had 443,000 sq. ft. of office space, bringing it within AM trip caps set in the CSP.

Planning Board passed Resolution 01–163 approving PSP 4–01048, finding that "adequate transportation facilities would exist to serve the proposed subdivision as required under Section 24–124 of the Prince George's County Code," and that the PSP was "generally in conformance" with CSP–98012.

## I.

### The District Council's AM Trip Cap

The protestants renew their argument that the Planning Board had no authority to disregard or revise the AM trip cap

that the District Council imposed as a condition on its approval of the CSP. The briefs submitted by the protestants, the Planning Board, and Peterson debate the circuit court's conclusions that there is no statutory requirement that a PSP must conform to its predecessor CSP, that the Planning Board stated sufficient reasons for its traffic adequacy finding, and that there was substantial evidence to support that finding.

We do not find it necessary to resolve those questions. Even if all of the circuit court's conclusions were correct, they would not affect the disposition of this appeal. Instead, given the unique development history of this property, the sole dispositive issue is whether the Planning Board erred in approving the reconfigured preliminary subdivision plan for the Beltway Parcel even though it did not comply with the District Council's AM traffic cap. For the reasons we explain below, we conclude that it did.

The Planning Board and circuit court agreed with Peterson that the PSP did not have to comply with the AM trip cap because it was merely the District Council's means of ensuring adequate transportation facilities for any reconfigured plan for the Beltway Parcel. In their view, since the evidence from Peterson's 2001 traffic study established traffic adequacy for the reconfigured Beltway Parcel, the PSP "substantially conformed" to the District Council's intent in imposing the trip cap, which was merely to require that there be adequate transportation facilities for whatever denser development Peterson might propose in a reconfigured plan for the parcel. We disagree with this interpretation of the trip cap condition, for two reasons.

### A.

### "Intent"

First, we do not agree that the District Council intended to give the Planning Board "final say" in approving this

reconfigured proposal to develop the Beltway Parcel. The administrative record establishes that the District Council reserved the right to impose specific limits on how this unique property would be developed, and then deliberately exercised that authority by imposing the AM trip cap as a limit on how much the developer could reconfigure its development plan without returning to the District Council.

- In 1983 and 1988, the District Council ensured that it would have the last word on the conceptual site plan for this site, by imposing condition 3 on the zoning map amendment. This condition prevents the Planning Board from finally approving a concept plan for developing this site without prior "review and approval of that plan by the District Council."

- On April 23, 1998, the Planning Board affirmed that, pursuant to condition 3 in the zoning map amendment, the Board had to obtain the District Council's approval for the National Harbor CSP. Condition 3 to the Planning Board's approval of the CSP provided that the Planning Board would not finally approve the CSP until the District Council reviewed and approved it.

- On June 10, 1998, the District Council exercised the power it reserved years earlier when it conditionally approved the CSP. In doing so, the Council imposed the AM trip cap as Condition 1 in its resolution conditionally approving the CSP.

What the District Council did is both simple and understandable. Recognizing the special traffic, aesthetic, and environmental concerns raised by the prospect of developing a huge urban destination resort in such a geographically sensitive location, the District Council exercised its power to impose conditions on the zoning map amendment. In 1983 and 1988, the Council required a conceptual plan for any mixed use proposal to develop this property and the Council reserved the right to review and approve any such plan. In 1998, it exercised that right by allowing Peterson to develop the Beltway Parcel with any combination of uses that generated

less than 1,226 AM peak hour trips. In this manner, the District Council ensured that no plan that would generate more traffic than the plan it had already reviewed could be approved without its permission.

The language of the District Council's 1998 resolution approving the CSP supports this interpretation and dispels the notion that the District Council's trip cap gave advance approval to any and all development plans for which there would be adequate transportation facilities. The trip caps set forth in Condition 1 are quantitative "limit[s]" on "[t]otal development within the Beltway Parcel." Although the District Council gave Peterson some flexibility to reconfigure the Beltway Parcel in order to allow "different permitted uses," it explicitly limited that flexibility by directing that only a reconfiguration "generating no more than the ... 1,226 AM peak hour trips ... may be allowed."

By setting this very specific numeric ceiling, the District Council did more than merely express its desire that there be adequate traffic facilities for any reconfigured plan to develop the Beltway Parcel. The District Council also said that it would not give advance approval to a reconfigured plan that generated more traffic.

We find it particularly significant that the District Council used the trip caps as an alternative to specific square footage limits. Instead of giving "reconfiguration *carte blanche*" to the developer, or appointing the Planning Board as the final arbiter of traffic adequacy for any reconfigured plan, the Council selected a specific number of vehicle trips as the measure for determining whether the developer and Planning Board could proceed to the next stage of development without further review by the District Council.

If, as Peterson, the Board, and the circuit court posited, the District Council intended condition 1 to be merely a way to ensure adequate transportation facilities for any reconfigured proposal to develop the Beltway Parcel, then it easily could have selected that alternative. Instead of imposing the trip caps, the Council could have used language to the effect that,

"Alternatively, different permitted uses generating no more trips than the number of peak hour trips that the Planning Board determines can be accommodated by existing and planned transportation facilities may be allowed."

But that is not what the District Council chose to say, and we cannot rewrite condition 1 by resorting to result-driven concepts of "intent" and "substantial conformance." *Cf. Ark Readi–Mix Concrete Corp. v. Smith,* 251 Md. 1, 4, 246 A.2d 220 (1968)("court cannot substitute its judgment for that of the zoning authorities"); *JMC Constr. Corp. v. Montgomery County,* 54 Md.App. 1, 17–18, 456 A.2d 931 (1983)(amending a zoning map is a valid exercise of plenary legislative power when the amendment " 'bears a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare' "). Indeed, if "traffic adequacy" is the District Council's only yardstick for approving the reconfigured plan, then Peterson should encounter little problem in obtaining Council approval of the plan proposed in the PSP.

We note, however, that the District Council may have other legitimate reasons for imposing limits on reconfiguring of the Beltway Parcel. Even if the Council were to be satisfied that there are adequate traffic facilities for the reconfigured plan, it may decide not to approve it. The Council had authority to limit development based on the impact of the reconfigured Beltway Parcel on surrounding properties, even if existing and planned roads could "handle" the increase in traffic generated by the new plan. *See* § 7–120, § 8–104(e); PG Code § 27–213(c). The AM trip cap may reflect that the District Council wanted to ensure that it had an opportunity to consider whether it should set a development limit at some level below "traffic adequacy" in order to balance such other legitimate zoning considerations.

For example, these elected officials may have wished to consider constituent concerns that a reconfigured Beltway Parcel plan that generates more traffic than the original CSP plan would spark other development trends affecting the surrounding community and infrastructures. Indeed, some

residents expressed concern that National Harbor would mushroom into "development sprawl," creating a "Tyson's Corner on the Potomac." By limiting reconfiguration of the Beltway Parcel to the same level of traffic that it approved in the original CSP, the District Council ensured that it could consider whether these constituent concerns warranted a decision to disapprove the reconfigured plan, or to impose other conditions on it.

## B.

### "Substantial Conformance"

■ Our second reason for concluding that the Planning Board erred in disregarding the AM trip cap is that the Board was bound by statute to enforce the cap. For the reasons that follow, we do not agree that the Planning Board had authority to approve a plan that exceeded the trip cap on the ground that the PSP "substantially conformed" to the District Council's intent to ensure traffic adequacy. Even if the District Council had not employed the trip cap as a means of preserving its right to review a materially reconfigured Beltway Parcel, we would still conclude that the AM trip cap is a mandatory condition that only the District Council can eliminate. We explain.

The trip caps were a direct result of a condition that the District Council placed on the zoning map amendment. The Council made it clear in 1983 and 1988 that it was amending the zoning map to permit a mixed use development on the Beltway Parcel, with the proviso that the Council could later limit development of this site by imposing conditions on its approval of the concept plan. In turn, the Council then made it clear in 1998 that it would permit Peterson to proceed with its development plans for the Beltway Parcel, on the understanding that it could not reconfigure those plans in a manner that increased morning traffic beyond 1,226 peak hour trips without bringing such a materially reconfigured plan back to the District Council.

The Planning Board agreed with Peterson that it could disregard the unambiguous trip cap condition on the theory that the reconfigured development plans for the Beltway Parcel "substantially conformed" to that condition. That was error. If the Planning Board may disregard the trip cap by using a "substantial conformance" standard, Peterson would be permitted to circumvent the condition 3 limits that the District Council placed on reconfiguring the Beltway Parcel without its approval. In effect, the Planning Board and Peterson could violate, without any consequence whatsoever, the statutory provisions that conditions attached to a zoning map amendment are "mandatory," that they "become a permanent part of the Zoning Map Amendment," and that they are binding until the District Council amends them. *See* § 8-104(e); PG Code § 27-213(c)(4), § 27-213(d).

We are in complete agreement with the MNCPPC staff's assessment of the statutory reason for enforcing the AM trip cap. In a July 17, 2001 memorandum to the Planning Board, the transportation staff opined that changing the Beltway Parcel from a primarily retail to primarily office proposal "raised a trip cap issue" because "the trip cap was placed on ... the Beltway Parcel during the review of SP–98012.... [as] Condition 1 of the District Council order affirming the Planning Board's decision in SP 98012." As staff pointed out, it did not matter whether the trip caps were designed to ensure the adequacy of transportation facilities, or whether the Planning Board found that the PSP provided adequate transportation facilities. In the unique circumstances surrounding development of the Beltway Parcel, the trip cap, because it was "imposed at the time of an earlier adequacy study which was reviewed and approved by the District Council[,] would not be subject to revision unless the subsequent cap were also subject to review by the District Council."

## C.

### Defenses

We are not persuaded otherwise by language that the Board and Peterson have cited in support of their "intent" and

"substantial conformance" rationales for disregarding the AM trip cap. We address each one separately.

## 1.

### Condition 9 To 1988 Zoning Map Amendment

■ The Board points to condition 9 to the 1988 zoning map amendment, which requires the Planning Board to "determine which alternate transportation improvements or systems are necessary to maintain acceptable levels of service at critical intersections and interchanges in the property's vicinity for that stage of development." It argues that this condition shows that the District Council intended the Planning Board to make the requisite findings of traffic adequacy "at the time of the CSP and again in the instant case."

That may be so, but it does not mean that traffic adequacy was the Council's one and only reason for imposing the trip cap. In our view, condition 9 simply shows that the District Council intended that the Planning Board would evaluate traffic adequacy much earlier in the development review process than otherwise would be required. The usual course prescribed by statute is for the Planning Board to determine traffic adequacy later, at the preliminary subdivision plan stage of review. *See* PG Code § 24–122.01(a), § 24–124(a). The District Council explicitly altered that usual course in the unique circumstances presented by the National Harbor plan, by imposing staging requirements that moved the critical issue of transportation adequacy to this earlier stage of development review. By imposing condition 9, the District Council directed the Planning Board to review traffic adequacy at the threshold conceptual plan stage of development.

We do not divine from this instruction any intent to appoint the Planning Board as the final arbiter for any and all reconfigured plans that Peterson might propose as its plan proceeded through the development review process. We see nothing to indicate that the District Council intended to limit the power that it reserved in condition 3 of the zoning map amendment to review and approve a materially reconfigured

plan, by simultaneously delegating away that authority to the Planning Board in condition 9. Rather, we read condition 9 as a practical instruction to the Planning Board that it must conduct an early review of traffic adequacy, so that the District Council would have the benefit of staff and Board expertise and conclusions when the Council reviewed Peterson's CSP.

### 2.

### Prefatory Finding In 1998 Order Affirming CSP

■ Similarly, we do not find persuasive the prefatory language from the District Council's 1998 order approving the CSP, which Peterson cites as proof that the trip cap should not be literally enforced. The District Council explicitly stated that it was affirming the Planning Board's approval of the CSP "based on consideration of the entire record, for the reasons stated by the Planning Board in its resolution," and because

> Conditions 1–5 of the Planning Board Resolution provide for the staging of the development so as to insure adequate public facilities for transportation are provided or constructed with the development of square footage of the project.

> Peterson argues that this language "supports the proposition that the only finding to be considered by the District Council . . . was based solely on the ultimate issue of adequacy of public facilities." Thus, the trip caps were "merely an outgrowth of, and subordinate to, the required findings subsumed in the overall requirement that the Project include adequate public facilities."

We again do not read this language so broadly. It is taken from the "findings and conclusions" portion of an order affirming the Planning Board's approval of the CSP. It appears on the page immediately preceding the Condition 1 trip cap. We see nothing in this prefatory language that negates the specific quantitative trip cap that the District Council imposed as its first explicit condition on its approval of the conceptual plan. As we discussed earlier, the trip cap was the means selected

by the District Council to ensure not only traffic adequacy, but also that the Council would have an opportunity to review any reconfigured proposal that created more traffic than the 1998 CSP.

### 3.
### Section 27–213(a)(3)(B)

 Finally, we are not persuaded that the Prince George's County Code authorizes the Planning Board to disregard the District Council's AM trip cap. The Board and Peterson cite the following language from subsection 27–213(a)(3)(B):

> The finding by the Council of adequate transportation facilities at this time [i.e., when amending a zoning map] shall not prevent the Planning Board from later amending this finding during its review of subdivision plats.

The Board and Peterson argue that this provision gives the Planning Board authority to disregard the District Council's AM trip cap because it "acknowledges that findings of adequate transportation made at the time of a ZMA approval are not binding on the Planning Board when considering a preliminary plan." They contend that this is logical because "infinitely more detail is known about the proposed development of a site at the time of preliminary review plan than at the initial ZMA approval." *Id.* at 10–11 n. 7, 456 A.2d 931.

The protestants counter by rhetorically asking, if the Planning Board is allowed to amend the District Council trip cap under the guise of this ordinance, "[w]hat would be the point in providing for Council review of a Board CSP?" If the Board did not like a specific condition that the District Council attached to a CSP, all it would have to do would be to disregard it in approving a subsequent preliminary subdivision plan that violates that District Council condition.

We again conclude that the Board and Peterson have interpreted this language too broadly. When read in the context of the entire enforcement scheme established in section 27–213, this subsection merely notifies developers that the Planning Board is not bound by a general finding of traffic adequacy

that is inherent in the District Council's initial approval of the zoning map amendment. It ensures that, even if a developer makes a showing of traffic adequacy at the time it obtains a zoning map amendment from the District Council, the Planning Board can still decide at a later stage in the development review process that traffic facilities are *inadequate* for the plan under review.

## D.

### Conclusion

It is undisputed that the reconfigured Beltway Parcel plan that Peterson proposed in its PSP exceeded the AM trip cap, and that the District Council neither approved nor reviewed this reconfigured plan. We hold that, because the National Harbor PSP exceeded the mandatory AM trip cap without the District Council's approval, the Planning Board erred in approving it. "[T]he failure to comply with any condition [to a zoning map amendment] . . . constitute[s] a zoning violation[.]" PG Code § 27–213(d)(1). We therefore vacate the Planning Board's order approving the PSP, and remand to the Planning Board for further proceedings consistent with this opinion.

## II.

### Noise Study

In their second assignment of error, the protestants argue that the Board erred in relying on an outdated noise study that was conducted for the abandoned PortAmerica project as grounds for concluding that Peterson had satisfied two separate District Council noise conditions: Condition 13 to the 1983 zoning map amendment and Condition 35 to the resolution approving the National Harbor CSP. Viewing the plain language of these conditions in their historical context, we shall hold that the Planning Board erred in finding that Condition 35 was satisfied, because Peterson did not submit the additional noise data that was necessary to determine Peterson's compliance with this condition.

## A.

## The Noise Studies And Conditions

### 1.

## Condition 13 To The Zoning Map Amendment And The PortAmerica Study

In 1983, when the District Council initially amended the zoning map, it imposed **Condition 13**. The Council directed that "[t]he comprehensive concept plan shall include a noise study demonstrating" the amount of external noise caused by traffic from National Airport and the Capital Beltway, as well as **"the anticipated effects of noise from the proposed development on adjoining residential areas."** (Emphasis added.)

In 1988, MNCPPC staff reviewed a March 9, 1988 noise study prepared for the PortAmerica project by Dames and Moore (the "PortAmerica study"). PortAmerica differed from Peterson's later National Harbor proposal in that its plan featured a separate "World Trade Center" hotel, office complex, and multi-family residential building, with the waterfront plan proposing upscale residences, some retail, and a visitor's center. PortAmerica did not include the 2.9 million square feet of "waterfront entertainment/retail" venues (including a pier, rides, and other outdoor entertainment) or the speed parking garage that Peterson proposed for National Harbor's Waterfront Parcel.

The PortAmerica study reported data and conclusions regarding "the sound quality of the area" in 1988, "prior to the construction and operation of the [proposed] PortAmerica facilities[.]" In addition, the study estimated how area sound levels would change "[a]fter PortAmerica has been built and occupied[.]" The study tested sound levels and sources at six locations, five of them in the neighboring residential communities of Oxon Hill Manor, Potomac Vista, and River Bend.

Data from these five locations showed that the 1988 "day-night average sound levels" ("Ldn") in these neighborhoods

ranged from a low of 60.1 to a high of 63.2 dB. According to the PortAmerica study, this data showed that existing noise exposure was already at "[m]oderate" but "[a]cceptable" levels "typical of land uses near highways and roads."

The report then anticipated how future highway and air traffic pattern changes would affect two of the five residential locations (in Oxon Hill Manor and Potomac Vista), which were "[n]oise-sensitive locations subject to the greatest change from future highway configurations and road traffic within PortAmerica[.]" The estimates reflected Federal Highway Administration noise prediction models and Federal Aviation Administration sound level contours for normal operating conditions of National Airport. The study also acknowledged that "traffic noise contribution to average ambient sound levels is expected to increase" due to construction of an S-curve in the Beltway, increase in traffic, and "the increased traffic and changed traffic patterns resulting from PortAmerica."

There was, however, no analogous model-based estimate of the noise level that would be generated by PortAmerica traffic in these two neighborhoods, one of which is near Peterson's proposed Waterfront Parcel, the other adjacent to the Beltway Parcel. Similarly, there was no estimate of the additional non-traffic noise anticipated from any of the retail, hotel, residential, and office uses proposed for either of the two parcels planned for PortAmerica.

Despite the lack of data about noise generated by the proposed development, the PortAmerica study concluded that PortAmerica would not significantly raise noise levels in adjacent residential communities.

While future sound levels at [these two test sites in neighboring residential communities] may increase because of the presence of PortAmerica, the increase in sound will not be significant and traffic noise will continue not to be the major source of community sound.....

The day-night average sound levels measured in communities near the PortAmerica site .... will not change significantly—if at all—due to the presence of PortAmerica. The

sounds observed in the communities are from local human, insect, and bird activity, aircraft activity and local and distant traffic. Main contributors at these receptor locations are local traffic and aircraft activity, which will not be affected by PortAmerica.

After reviewing the PortAmerica data, MNCPPC staff concluded that, "except for that area near the Capital Beltway, exterior noise from combined airport and highway noise would not exceed 65 dBA (Ldn) and none of the residential areas were significantly impacted."

2.

### The CSP And The Loiderman/PortAmerica Study

Ten years later, in order to satisfy the noise study requirement of Condition 13 for its National Harbor CSP, Peterson relied on the same PortAmerica study and data. In April 1998, Peterson submitted "a noise study and map prepared by ... Loiderman Associates" (the "Loiderman/PortAmerica study"). Although this study was dated April 1998, MNCPPC staff pointed out that "[t]he heart of the report is a copy of pages A–184 through A–198 of" the 1988 PortAmerica study.

In an April 10, 1998 memorandum, an MNCPPC environmental planner opined that this data from the 1988 PortAmerica study provided a sufficient factual basis to conclude that noise from external sources would not exceed allowable levels inside National Harbor. According to this planner, the PortAmerica data showed that there would be no recorded noise levels above the 65 dBA (Ldn) within the National Harbor site. "Since this [National Harbor] CSP has no residential component, [staff] agree[d] with the ... analysis by [Loiderman Associates] that noise from external sources is not significant."

At the same time, however, MNCPPC staff raised questions about whether the Loiderman/PortAmerica study provided an adequate evidentiary basis for concluding that the noise generated by National Harbor would not exceed permissible noise levels in adjoining neighborhoods. Of concern was noise from

entertainment planned for the Waterfront Parcel and from the speed parking garage, which is situated along the boundary between the Waterfront Parcel and a residential neighborhood.

**Staff have some small concern that the site may generate noise.** We expect that traditional holidays, e.g., The 4th of July and New Year['s] Eve, will have their share of crowds, fireworks, and noisemakers. **We are uncertain if outdoor activities, such as festivals or music bands, may occur and if they may generate noise which would impact neighboring residential properties.** The State of Maryland has a noise ordinance which should be sufficient to regulate any instances.

**The proximity of the principal ingress/egress and the speed parking garage to existing residences is a concern.** Prior to the issuance of the building permit for the speed parking garage, **a noise study shall be submitted to the Natural Resources Division demonstrating that adequate noise abatement measures have been taken to avoid any significant impact to existing residential structures.** (Emphasis added.)

### 3.

### District Council Condition 35

Quoting the April 1998 staff memorandum, the Planning Board approved the National Harbor CSP with a new noise study condition that reflected the staff's concern about the parking garage.

Prior to issuance of the building permit for the speed parking garage, a noise study shall be submitted to the Natural Resources Division demonstrating that adequate noise abatement measures have been taken to reduce noise levels to 65 dBA Ldn at the property lines of residential lots. Noises generated by car alarms shall be included in this noise study. E57.

In June 1998, the District Council also approved the National Harbor CSP. It, too, conditioned its approval of the PSP

on an additional noise study regarding the parking garage. Implementing the staff and Planning Board recommendation that Peterson submit additional data regarding the effect of the parking garage on adjacent residences, the District Council imposed **Condition 8.** Instead of allowing Peterson to submit that information at the building permit stage of development review, however, the District Council required Peterson **"to submit a *limited Detailed Site Plan* for the proposed speed parking garage located within the Waterfront Parcel."** (Emphasis added.)

In contrast to the Planning Board, which required only new data concerning the parking garage, the District Council required Peterson to amend the Loiderman/PortAmerica study to add data estimating the anticipated noise generated by the entertainment venues in the Waterfront Parcel. The Council explicitly conditioned its approval of the CSP on Peterson amending that study to examine what the PortAmerica study data did not anticipate—the noise impact of 2.9 million square feet of "waterfront entertainment/retail" on its residential neighbors.

Reiterating the staff's concern about the adequacy of the Loiderman/PortAmerica study, the Council also added "Finding 4" to the findings and conclusions made by the Planning Board:

> [Peterson's] **Noise study should be amended to include additional information relative to the impact of noise, particularly from the various entertainment venues, on the adjacent residential property.** The amended Noise Study, which may be done anew, should be provided and reviewed in concert with the Noise Study for the Parking Garage adjacent to [the central Waterfront Parcel development located in] Zone B. (Emphasis added.)

The District Council then affirmed the Planning Board's approval of the National Harbor CSP subject to 39 written conditions. In addition to Condition 8, it addressed the staff's concern that the entertainment venues would generate noise

that exceeded levels permitted by state law by imposing **Condition 35,** which required that

**[c]ompliance with State noise regulations shall be determined with regards to sound generated by** National Airport, the Capital Beltway and **the subject property prior to approval of the Preliminary Plat of Subdivision.** (Emphasis added.)

### 4.

### Noise Study Challenge To The CSP

Karen Egloff, who grew up in Oxon Hill Manor and whose mother still lived there, petitioned for judicial review of the CSP approval. *See Egloff v. Dist. Council of Prince George's County,* 130 Md.App. 113, 744 A.2d 1083, *cert. denied,* 358 Md. 381, 749 A.2d 172 (2000). She argued, *inter alia,* that the ten year old study done for the more residential PortAmerica plan did not provide adequate information about the noise impact of the presumably louder entertainment-oriented plans for National Harbor. She asked the circuit court to vacate the approved CSP, and to remand the plan to the District Council, on the ground that the Loiderman/PortAmerica noise study did not satisfy mandatory Condition 13 to the 1983 zoning map amendment.

In November 1998, the circuit court agreed with Egloff that the Loiderman/PortAmerica study "did not address the impact of the proposed [National Harbor] uses on the adjoining residential areas as required by Condition 13[,]" because "there was no evidence in the record that addressed the impact of entertainment uses o[r] the speed parking garage." The court concluded that the study did not contain enough information to satisfy Condition 13's requirement that Peterson submit a noise study "demonstrating ... the anticipated effects of noise from the proposed development on adjoining residential areas." It vacated the District Council's order approving the National Harbor CSP, and remanded for Peterson to submit additional data regarding noise from the entertainment venues and speed parking garage.

In February 2000, however, we vacated the circuit court's order because Egloff did not have the permanent residency necessary to establish standing to challenge the CSP approval. *See id.* at 128, 134, 744 A.2d 1083. The effect of our decision was to leave the District Council's CSP approval intact.

## 5.

## The PSP

Peterson then began to move from its conceptual plan toward the next stage of development review, the more detailed preliminary subdivision plat. During the next 15 months, Peterson refined and reconfigured its plans for National Harbor. Nevertheless, despite the District Council's Condition 35 requirement that National Harbor show compliance with State noise regulations "prior to approval of the Preliminary Plat of Subdivision," Peterson did not submit any new noise data to support its PSP. In a May 2001 review of that PSP proposal, MNCPPC staff looked once again to the data reported in the Loiderman/PortAmerica study; indeed, it simply attached its April 1998 memorandum regarding that study as a supplement to its report.[11]

By resolution, the Planning Board conditionally approved the PSP. In doing so, the Board reiterated the staff's 1998 comment that state noise regulations would prevent noise

---

11. Staff later raised another concern about the Loiderman/PortAmerica study. In a June 22, 2001 memorandum, an engineer from the Division of Environmental Health noted that

[t]he property contains a portable concrete mixing plant located in close proximity to residential units. Its location presents significant issues concerning noise and dust. It is important, prior to record plat approval, that the applicant can support the current location of the concrete mixing plant by supplying to this office ... [a] noise study that shows that the concrete mixing plant can meet the State Noise Regulations for the time in which the plant is expected to be in operation.... If the noise study shows that the operation of the plant violates State Noise Regulations, then either noise abatement procedures must take place to meet State Noise Regulations, or the concrete mixing plant must be moved to a location that does not impact the residences in the area. The relocation of the plant must occur prior to record plat approval.

problems from the entertainment venues, but deleted the staff's acknowledgment that it was uncertain about the nature and level of such noise. Without mentioning Condition 13 to the zoning map amendment, the Board concluded that the National Harbor PSP complied with state noise regulations, and therefore that Peterson had satisfied Condition 35 to the District Council's CSP resolution.

## B.

### Adequacy Of Loiderman/PortAmerica Study

██ The protestants complain that Peterson has "never carried out" the comprehensive study of noise that National Harbor is anticipated to create in adjacent neighborhoods, as required by Condition 13. This failure, in turn, made it impossible for the Planning Board to determine whether National Harbor would exceed state noise regulations, as required by Condition 35. They point out that the circuit court clearly explained why the Loiderman/PortAmerica study was inadequate, that the District Council directed Peterson to amend the study to add data about noise from the entertainment venues and parking garage, and that the District Council also limited the Planning Board's authority to approve the PSP by requiring it to first determine whether Peterson's proposal generated noise in excess of state standards. In their view, the Planning Board's approval of the National Harbor PSP without an adequate noise study violated the zoning condition.

We agree. Both the explicit language and the contextual history of Condition 35 establish that the District Council required Peterson to present more specific data than the 1988 data in the Loiderman/PortAmerica study, and that it also required the Planning Board to consider this new data in deciding whether to approve the preliminary subdivision plan.

When it first rezoned this site in 1983, the District Council mandated that prospective developers had to submit, at the threshold "concept" stage of development review, data "demonstrating" how a proposal to develop this site would affect

neighboring residents. The Loiderman/PortAmerica study did not satisfy that mandate, because it did not adequately "demonstrat[e] . . . . the anticipated effects of noise from [National Harbor] on adjoining residential areas."

This is not surprising news. In 1998, MNCPPC staff, the Planning Board, and the District Council all separately acknowledged that the Loiderman/PortAmerica study did not include any data or estimate showing how much noise the 2.9 million square feet of waterfront entertainment venues could be expected to generate in neighboring residential communities. As MNCPPC engineers have been quoted at each stage of the National Harbor development review, the Loiderman/PortAmerica study left planners and the public **"uncertain if outdoor activities, such as festivals or music bands, may . . . generate noise which would impact neighboring residential properties."** (Emphasis added.) This study did not adequately measure the anticipated noise that the retail, hotel, commercial, and residential uses proposed for PortAmerica would generate in adjacent neighborhoods, much less purport to measure the anticipated noise from the materially different entertainment, retail, and office uses proposed for National Harbor.

Neither did that study show what noise could be anticipated from the speed parking garage and the construction concrete mixing plant. As MNCPPC staff also consistently acknowledged, additional data was needed to determine whether noise abatement measures would be necessary "to avoid any significant impact to existing residential structures." Reviewing the Loiderman/PortAmerica study in 1998, the District Council unambiguously stated that Peterson would have to submit more data to clear up those uncertainties surrounding the parking garage and concrete mixing plant.

Read in its entirety and in its historical context, the plain language of the District Council's resolution conditionally approving the CSP reveals that the Council found that the Loiderman/PortAmerica study did not fully satisfy Condition 13 because it did not adequately demonstrate the anticipated

noise impact of National Harbor on its residential neighbors. The Council expressed this conclusion in Finding 4 and Condition 8, which instructed Peterson to amend the Loiderman/PortAmerica study to address unanswered questions about noise from the entertainment venues and parking garage. Then, in Condition 35, the Council made certain that the Planning Board could not allow National Harbor to progress to the next stage of development without that additional information.

In this manner, the District Council's resolution explicitly spelled out for Peterson (1) the deficiencies in the Loiderman/PortAmerica study—*i.e.*, no data anticipating noise generated by entertainment venues and the parking garage; (2) what Peterson would have to do about those deficiencies—*i.e.*, "amend" the PortAmerica/Loiderman study to add data demonstrating that anticipated noise from National Harbor uses would comply with State regulations limiting noise; and (3) when Peterson would have to accomplish these tasks—*i.e.*, "prior to approval of the Preliminary Plat of Subdivision."

Although Condition 13 required Peterson to demonstrate the anticipated noise from these uses at the conceptual plan stage of development, District Council Condition 35 effectively gave Peterson more time to satisfy its obligations under Condition 13. The protestants posit that the District Council did not have authority to excuse the deficiencies in the Loiderman/PortAmerica study by extending its own deadline, given that Condition 13 was a mandatory condition attached to a zoning map amendment. But we need not resolve that question to resolve this appeal. Even if we assume that Condition 35 was an impermissible extension of time for Peterson to submit the missing noise data necessary to satisfy Condition 13, it is clear that Peterson also missed the preliminary subdivision plan deadline for submitting that additional data.

From the clear language and history surrounding Condition 35, we conclude that Peterson failed to cure the deficiencies in the Loiderman/PortAmerica study. Undisputedly, Peterson did not submit any new data in support of its PSP. It

therefore failed to provide the Planning Board with the evidentiary record that the Board needed to satisfy Condition 35. The Planning Board erred in approving the PSP without a sufficient factual basis for concluding that the uses proposed for National Harbor would comply with state noise regulations.

## C.

### Defenses

The Planning Board and Peterson contend that Peterson's failure to conduct additional noise studies did not prevent the Planning Board from approving the National Harbor PSP for several reasons. We address and reject each in turn.

### 1.

### Prior Noise Study Challenge

Peterson curiously contends that the same noise arguments raised by the protestants in this appeal were "long ago rejected and resolved in both the circuit and appellate courts." We disagree.

Peterson fundamentally misunderstands the effect of our decision in *Egloff*. Although Ms. Egloff and others did argue that Peterson failed to satisfy Condition 13, we did not reach that question. To the contrary, we held that neither we nor the circuit court could answer it because none of the appellants had standing to challenge the District Council's approval of the CSP. *See Egloff*, 130 Md.App. at 127–28, 744 A.2d 1083. Consequently, we vacated the circuit court's decision to partially affirm and partially vacate the CSP approval. As a result, there was no valid judicial review of the Condition 13 noise study challenge, either at the circuit court or the appellate level.

More importantly, the protestants' challenge here is based on Condition 35 of the District Council's CSP resolution in 1998. That challenge is necessarily new to this petition for judicial review. When Egloff challenged the adequacy of

Peterson's noise study, she relied solely on Condition 13 because, by its terms, Condition 35 could not have been violated until the Planning Board approved the PSP in 2001.

## 2.

### Timing

 The Planning Board asserts that it is too late for the protestants to complain that Peterson failed to satisfy Condition 13, because that condition is now "inapplicable[.]" The Board argues that, by its terms, Condition 13 requires a developer to demonstrate how noise from its project will affect residential neighbors as part of its initial "comprehensive concept plan," not as part of its later preliminary subdivision plan.

We do not agree that Peterson's success in avoiding review of the Condition 13 noise challenge to the CSP necessarily prevents enforcement of its noise study requirements at later stages of development review, because the Council's subsequent imposition of Condition 35 was an extension of the mandatory noise study requirement imposed by Condition 13 to the preliminary subdivision plan stage of development review. By imposing Condition 35, the District Council explicitly circumscribed the Planning Board's authority to approve the PSP, ensuring that it could not do so without determining whether Peterson's plan complied with state noise standards. As the Council pointed out in Finding 4, an amended or new noise study was necessary to make that determination.

We do not read other language in the District Council's resolution approving the CSP as permission for Peterson to delay submitting an amended or new noise study until after approval of the PSP. The Board and Peterson interpret the District Council's Finding 4 and Condition 8 as authorization for Peterson to wait until the detailed site plan or building permit stages of development review. They point out that these provisions state that the amended or new noise study showing noise levels from entertainment venues and the park-

ing garage "should be provided and reviewed" together, "[a]s part of Detailed Site Plan approval[.]"

■ Reading this language as permission for Peterson to wait until the detailed site plan stage to submit the new noise data, however, would render the explicit language in Condition 35 that compliance with state noise regulations must be determined "prior to approval of the preliminary site plan" entirely nugatory. This interpretation would mean that the Planning Board would be obligated to make a factual finding that National Harbor complies with state noise regulations on the basis of either (1) the same Loiderman/PortAmerica study that the District Council concluded did not include enough data about noise from the entertainment venues and parking garage to determine whether these uses will comply with State noise regulations, or (2) new data that Peterson had yet to submit. Whenever possible, we avoid constructions that render unambiguous language by a zoning authority meaningless, inconsistent, or absurd. *See Mayor and Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 549–50, 814 A.2d 469 (2002).

Instead of interpreting Finding 4, Condition 8, and Condition 35 in a manner that creates such problems, we adopt another construction that reconciles all three provisions. When we read them *in pari materia* with each other, we conclude that the District Council created a two-step procedure by which Peterson could cure the noise study deficiency and the Planning Board could evaluate the anticipated noise impact of National Harbor on its neighbors.

Finding 4, Condition 8, and Condition 35 required Peterson to supply the additional data at the PSP stage of development review, in time for the Planning Board to use that information in determining whether the planned entertainment venues and parking garage would create excessive noise in adjacent communities. If the new data demonstrates that the "anticipated effects of noise from the proposed development on adjoining residential areas" are so great that the project violates State noise regulations, then the Planning Board can either disap-

prove the PSP or approve it on the explicit condition that Peterson reduce noise levels in those communities, through noise abatement techniques or reconfiguring its plan. As Condition 8 demonstrates with respect to the parking garage, and Finding 4 demonstrates with respect to the entertainment venues, Peterson then would have until the ensuing detailed site plan stage of development review to explain the details of any noise abatement plans.

We reject the contrary construction advanced by the Board, in which Peterson could proceed without additional noise data to the detailed site plan stage of development review, and by Peterson, in which it could proceed even farther to the building permit stage.[12] These constructions would require us to wholly ignore the District Council's clear instructions in Condition 35 that noise data regarding the impact of National Harbor on neighbors must be evaluated early in the development process. The link between Finding 4, Condition 8, and Condition 35 is that, unless and until Peterson submits additional noise data, the Planning Board may not permit Peterson to pursue its development plans beyond the preliminary subdivision plan stage of development.

### 3.

### Subdivision Regulations

■■■ Both the Board and Peterson assert that it was not necessary for the Planning Board to make noise impact findings because the Prince George's County Code provisions governing subdivisions do not require them. *See* § 24–119 *et*

---

12. Peterson asserts in its brief that Condition 35 cannot be enforced yet because it only requires compliance with noise standards "prior to issuance of the building permit for the speed parking garage[.]" This is incorrect. Peterson is relying on the Planning Board's language in conditionally approving the PSP, not the "prior to approval of the Preliminary Plat of Subdivision" language that the Council adopted when it imposed Condition 35. Because the Council created Condition 35 by exercising the authority that it reserved when it amended the zoning map, the language in the Council's condition governs.

*seq.* As we discussed with respect to the trip cap, however, the lack of Code provisions is immaterial in this instance.

By imposing conditions on both the zoning map amendment and its approval of the CSP, the District Council required the Board to make findings about noise impact. These special noise study requirements underscore that, since 1983, the Council has expressed concern about the level of noise that may be generated by any plan to develop this unique property. The Planning Board, therefore, was obligated to comply with these conditions.

## C.

### Maximum Noise Levels

The protestants also argue that the Planning Board erred in concluding that Condition 35 was satisfied, because the Loiderman/PortAmerica study itself showed noise levels that violate current State noise regulations. They point out that, although the study reported decibel levels measured in the "24 hour day-night average" guidelines for noise exposure, it did not examine whether noise levels exceeded the more stringent maximum decibel levels for day and night exposure in residential and commercial areas. *See* Md.Code (1982, 1996 Repl. Vol.), § 3–401(b) & (c) of the Environment Article; COMAR 26.02.03.03B (Tables 1 and 2). *See Anne Arundel County Fish & Game Conservation Ass'n, Inc. v. Carlucci,* 83 Md. App. 121, 126–27, 573 A.2d 847, *cert. denied,* 320 Md. 800, 580 A.2d 218 (1990)(distinguishing between 24 hour standards, which are based on averages, and day-night maximum exposure limits, which are not based on averages). In particular, the protestants assert, some of the decibel levels reported and projected in the Loiderman/PortAmerica study exceeded the current maximum for noise, both at night in residential areas (55 dBA) and commercial use areas (62 dBA), and during the day in residential (65 dBA)and commercial areas (67 dBA).

Peterson disputes that the day-night maximum exposure standards in Table 2 are enforceable ceilings on noise

levels. It argues that these are "goals" rather than mandatory maximums.

We conclude that the day-night noise levels set forth in Table 2 of COMAR 26.02.03.03 are ceilings, not mere guidelines. The 24 hour noise averaging "Standards for Environmental Noise" in Table 1 "are goals for the attainment of an adequate environment." These standards are followed by "General Regulations" establishing "Noise and Vibration Prohibitions." In contrast to the goal-oriented "Environmental Noise standards" set forth in Table 1, the "Maximum Allowable Noise Level (dBA) For Receiving Land Use Categories" set forth in Table 2 are mandatory. The regulation states that the Table 2 "standards . . . are intended to achieve" the noise environment goals set forth in Table 1. But, as the regulation explicitly states, "A person may not cause or permit noise levels which exceed those specified in Table 2[.]"

Consequently, in determining whether the anticipated noise generated by National Harbor "compli[es] with State noise regulations[,]" as required by Condition 35, the Planning Board is obligated to consider the mandatory noise exposure maximums set forth in Table 2.

## III.

### Other Conditions To The Zoning Map Amendments

The protestants contend that "[b]esides noise, several other conditions" of the 1983 and 1988 zoning map amendments "have not been met." As with the noise study requirement, Peterson counters that the protestants are barred from arguing that these conditions have not been satisfied because they previously challenged them, unsuccessfully, in their petition for judicial review of the CSP approval.[13] Similarly,

---

13. Peterson also complains that "the delay occasioned by the instant appeal was intended to further protract and prolong Peterson's ability to develop its Property using the intensely time consuming administrative and judicial processes." Although we understand that this appeal and the protestants' prior challenges have caused Peterson delay and expense, our decision confirms that there have been legitimate grounds

Peterson and the Board assert that PG Code section 27–213(a) authorized the Board to disregard these conditions and that the time for challenging these conditions has passed, because all of them "call for compliance at times other than preliminary plan review."

The protestants reply that, even though the circuit court ruled on these conditions in reviewing the CSP approval, since these zoning map amendment conditions remain in effect, and the Planning Board approved the PSP for the same reasons it approved the CSP, those reasons are now subject to judicial review. We agree that the protestants' challenges to these conditions are neither barred nor untimely, because the conditions were repeated in the District Council's 1998 resolution approving the CSP. We therefore address each challenged condition in turn.

### A.

### Condition 7: Economic Feasibility

In 1983, the District Council imposed **Condition 7,** which provides that

[t]he comprehensive concept plan shall include a staging plan . . . . show[ing] each separate stage of development of all of the properties being rezoned—X-T with the subject property. . . . **The staging plan shall also include a market analysis demonstrating the economic feasibility of each development stage.** (Emphasis added.)

In approving the CSP, the Planning Board and District Council both found that Peterson had

---

for these challenges. Peterson has made the strategic decisions that, in turn, have resulted in these challenges. For example, when Peterson decided to reconfigure the Beltway Parcel in a manner that exceeded the District Council's trip cap, it elected to seek approval of its PSP instead of asking the District Council to amend the CSP. Similarly, although the District Council and the circuit court warned Peterson that the Loiderman/PortAmerica noise study would have to be supplemented, Peterson elected not to conduct any more noise studies. These choices held patent risks with predictable consequences, including the delay and expense of this appeal.

submitted a preliminary study of National Harbor's Visitor Potential (February 1997). **This study does not analyze the economic feasibility of each development stage as the project is considered an integrated whole in which all of the various elements are mutually interdependent.** (Emphasis added.)

The circuit court, in its vacated order affirming the CSP, rejected a similar claim that Peterson had not submitted the requisite market analysis demonstrating the economic feasibility of each stage of development. The court found that "[t]he District Council .... had the benefit of a ... market analysis[,]" which "showed how each development phase was interdependent of each other."

When it submitted its PSP for approval, Peterson did not present any economic feasibility study. In its resolution approving the PSP, the Planning Board did not mention Condition 7. The protestants complained to the circuit court that the Board simply "excused the noncompliance[.]" In support, they pointed to the Board's silence in 2001 and its 1998 admission that Peterson did not submit a market analysis that satisfied the feasibility study condition. The circuit court agreed with the Planning Board and Peterson that "Condition 7 .... call[s] for compliance at times other than preliminary plan review."

In this appeal, the protestants renew their claim that the Planning Board improperly disregarded the economic feasibility condition. They assert that the District Council condition is mandatory, and shows that the Council expected that this site would not be disturbed unless the developer could show that each stage of the proposed development would be economically viable. Complaining that "Peterson seeks to hide the fact that it is seeking approval to advance a speculative project[,]" they point out that "the recent turndown and uncertainty in the national economy, particularly travel and tourism, due to the terrorist events of September 11, 2001, and the ... war in Iraq" only increase the need for Peterson to satisfy Condition 7.

We agree with the protestants that Condition 7 is still in effect, even if it did "call for [initial] compliance at times other than the [PSP]." *See* § 8–104(e)("No ... subdivision plat may be issued or approved ... except in accordance with conditions set forth in the resolution"); PG Code § 27–213(c)(4)("Conditions imposed by the District Council ... shall be binding for as long as the Mixed Use Zone remains in effect on the property (unless amended by the Council)"). By requiring market analysis at the earliest stage of development review, the District Council indicated its concern that any proposal to develop this unique site must be economically viable from the initial stages of development to the last. It hardly seems necessary to say that the Planning Board was not free to disregard either the condition or the Council's underlying concern merely because we are past the conceptual site plan stage of development.

Ultimately, however, we do not agree with the protestants that Peterson failed to satisfy Condition 7. As the circuit court recognized in reviewing the CSP, the Planning Board and District Council did have the benefit of a market analysis submitted in support of the CSP—the February 1997 study of National Harbor's visitor potential. Although we do not have that study in the record before us, we can discern from the comments of MNCPPC staff, the Planning Board, and the District Council that it reviewed Peterson's proposal to develop National Harbor as "an integrated whole," rather than as separable stages of construction, because "all of the various elements [of National Harbor] are mutually interdependent."

This study recognized that National Harbor would be built as a mixed use project from the outset, rather than in sequenced construction stages in which, for example, retail space is developed first, followed by hotels, then entertainment venues, then offices. Though such sequenced development may have been the concept for the retail, hotel, office, and residential uses planned for PortAmerica, this study apparently indicated that this was not how Peterson planned to develop National Harbor. Moreover, because National Harbor envisioned multiple "mutually interdependent" uses, the District

Council found that "[t]his provides a greater likelihood that all phases of the development will be constructed" and that the economic viability of each aspect of the project was best assessed as whole.

We see nothing to indicate that the protestants have challenged this "interdependency" conclusion. Consequently, the 1997 market analysis did establish the economic feasibility of the project through each stage of development. We therefore agree with the circuit court that this study satisfied Condition 7.

### B.

### Conditions 8e, 8g, and 20: Architectural Quality

 The protestants assert that the Planning Board also improperly excused Peterson's failure to comply with the several zoning map conditions relating to the architecture of National Harbor. **Condition 8** provides:

In order that ultimate development of the subject property ... will be of ... "exceptionally high quality" ..., the comprehensive concept plan and final plan of development submitted to the Planning Board shall: ...

8e. "Show a cohesive architectural theme for all development ... incorporating building design and materials, signs, street furniture, and landscaping, so that the Planning Board may make a finding that the architectural design of the entire development is unified and of high quality;" ... [and]

8g. "Demonstrate a distinctive architectural theme, to take advantage of views of the subject property from the Capital Beltway, the Potomac River, and the Virginia shoreline[.]"

Similarly, **Condition 20** requires that "[t]he comprehensive concept plan shall show how the Smoot Bay Waterfront Center is 'of exceptionally high quality in terms of architecture and site planning[.]' "

The protestants argue that, "[s]ince Peterson has not selected an architectural theme and has only a vague concept at this

point, the Board could not make the actual finding required under Zoning Condition # 8e." They point out that, instead of finding that Peterson had not satisfied these architectural quality conditions, the Board again excused the noncompliance:

The information provided ... does not specifically commit or bind [Peterson] to any **particular** theme, style, building design or materials which would enable the Planning Board to perform the analysis necessary to make this finding without qualification. From the information presented to date, it is possible to conclude that by a lengthy and repeated expression of [Peterson's] intentions by means of text, graphics and photographs, the Conceptual Site Plan commits the developer to deliver a unified and high quality architectural design for the entire development during future phases in the development process when greater detail will be available.

The protestants posit that the "Board can not legally make the required findings when Peterson has failed to identify what it intends to build or what it will look like." We view this as challenging whether (1) the Board made the finding required by these conditions, and (2) the record contains substantial evidence to support such a finding. We answer "yes" to both questions.

First, we do not agree with the protestants' view that these conditions required the Planning Board to review and approve a single fully articulated architectural theme at this early stage of development review. To be sure, the conditions require Peterson to select and demonstrate a single unified theme, and require the Planning Board to review and approve that theme. But the prefatory language in Conditions 8 and 20 indicates that the exact nature of that theme is a matter for continuing refinement, beginning with "the comprehensive concept plan" through the "final plan of development" to "ultimate development of the subject property[.]" At the initial conceptual plan stage, the evidentiary showing must be sufficient to allow the Planning Board to find that "the architectural design of the entire development is unified and of high

quality," and that it "take[s] advantage of views" from the Beltway, the river, and the opposing shoreline. We read these conditions as requiring Peterson to demonstrate its intent to use a single unified theme using these site advantages, but not necessarily as a requirement that it identify the specific theme at the threshold conceptual site plan stage of development.

The Planning Board and District Council found that Peterson had submitted enough evidence that they could make the necessary threshold finding that National Harbor's architecture would be unified, of high quality, and site sensitive. We agree that Peterson submitted enough evidence to support those findings. As MNCPPC staff, the Planning Board, and District Council pointed out in 1998, and the staff and Planning Board reiterated in 2001, Peterson submitted an "extensive catalogue of photographic examples" from thirty-five "resort-oriented" developments "around the nation and the world[,]" featuring themes such as "waterfront and mountain resorts." Peterson represented that those fully developed "exemplars" "will serve as benchmarks for National Harbor[.]" Peterson also submitted a "Site Massing Diagram" that the Board and Council concluded "demonstrat[ed] site planning of exceptionally high quality." It also submitted "text describing signage and landscaping programs[.]" Peterson planners provided testimony regarding architectural theme plans. Together, this evidence supported the Planning Board's finding that, thus far, Peterson has satisfied Conditions 8 and 20.

## C.

### Condition 14: Water Quality Study

The protestants complain that the Planning Board also improperly excused Peterson's failure to comply with zoning map **Condition 14,** which provides that

[t]he Comprehensive Concept Plan shall include a water quality study which addresses the following:

a. Effects on Smoot Bay from construction of pilings, bulkheads, dredging and fill operations, and all other activities required for development above water;

b. Changes to the water quality of Smoot Bay which may result from proposed inland and shoreline development;

c. All potential pollution which may result from the operations of the proposed marina, such as fuel spills, seepage of pollutants from engines and bilges, pollutants leaching from hulls, and disposal of effluent from marina sanitation devices; and

d. The flushing characteristics of Smoot Bay.

Reviewing the CSP in 1998, the Planning Board acknowledged that Peterson had not submitted a water quality study. Instead, Peterson "indicate[d] that an environmental analysis of Smoot Bay's water quality and flushing characteristics is being initiated but is not yet complete."

The Board nevertheless concluded that Peterson had satisfied many of the specific requirements of Condition 14 by showing that it had obtained permits and approvals from various government agencies with jurisdiction over water quality issues. Specifically, the Board pointed to

● the conditions and requirements imposed by the United States Army Corps of Engineers permit regulating dredging and filling operations, and construction of the bulkhead;

● a Maryland Department of Environment Water Quality Certification requiring Peterson to undertake measures designed to ensure safe handling of petroleum products, to prevent fuel spills, and to provide sufficient sewage disposal facilities; and

● a Stormwater Management Concept Approval issued by the Department of Environmental Resources, which "addresses maintenance of the water quality of Smoot Bay by requiring treatment of the project's stormwater with Best Management Practices ... reduc[ing] the level of pollu-

tants in stormwater entering the bay from the site to less than predevelopment conditions."

The Planning Board acknowledged, however, that Peterson had not yet prepared or filed its dredge and disposal plan with the Maryland Department of the Environment or the Prince George's Soil Conservation District.

The circuit court, in its vacated order affirming the CSP, concluded that these various government permits and approvals "allowed the District Council to conclude that the CSP was in compliance with Condition 14." When Peterson submitted its PSP, MNCPPC staff did not discuss Condition 14 or acknowledge receipt of a water quality study. The Planning Board's resolution approving the PSP was similarly silent.[14]

In this appeal, the protestants renew their contention that "Peterson did not submit the required [water quality] study" and that "[t]he Board provided excuses" for noncompliance "rather than findings." In their view, compliance with the terms of an Army Corps permit, a stormwater management plan, and a certification regarding safe waste and fuel handling practices did not substitute for the water quality study required by mandatory Condition 14.

The Board's sole response, again, is that the circuit court correctly concluded that Condition 14 "call[s] for compliance at times other than preliminary plan review." We have rejected that contention, and explained why these mandatory conditions to the zoning map amendment remain enforceable until they are amended or satisfied. The question, then, is whether Peterson fully satisfied Condition 14, either at the conceptual site plan stage or in the time between the CSP approval and the PSP approval.

Neither the Planning Board nor the circuit court answered that question. Neither the Board nor Peterson has asserted

---

14. The circuit court declined to consider the protestants' Condition 14 argument, on the ground that "[t]he time to appeal the [CSP] approvals has expired." As we have explained, however, the Condition 14 requirements remain in effect until the District Council amends or eliminates them.

.

that the study that was initiated in 1998 has been completed. Nor have they attempted to explain how the permits and approvals cited by the circuit court collectively constitute the water quality study required by Condition 14.

Without such information in this administrative record, we cannot conclude that Condition 14 has been satisfied. Consequently, that is another matter that the parties and Planning Board must address on remand.

## D.

### Condition 18: Engineering Studies Regarding Over–Water Construction

**Condition 18** of the zoning map amendment requires that, "[f]or uses proposed above water, the Comprehensive Concept Plan shall include engineering studies for review by the Department of Licenses and Permits to indicate techniques for constructing proposed pilings or other over-water development." In 1998, the Planning Board found that "[t]his information has not been submitted with the Conceptual Site Plan." As a result, the Board decided that "[p]rior to certificate approval of the [CSP], the applicant shall submit for review and approval by the Department of Environmental Resources, [the] engineering studies" required by Condition 18.

The District Council agreed that the studies had not been submitted, but noted that Peterson's

> proposal for construction over and above water must be reviewed by the Army Corps of Engineers, pursuant to an amendment or revision to the existing applicable Corps Permit or a new permit. It is impractical to provide the required engineering studies relative to the construction of the proposed pilings or other over-water development until such time as that review is completed or has commenced.

In the Council's view, Peterson needed more "time . . . to compile this information and present it to the Department of Environmental Resources." Nonetheless, the Council reiterated that certificate approval of the CSP would be conditioned

on review and approval of these engineering studies by the Department of Environmental Resources.

Neither the MNCPPC staff memorandum regarding Peterson's PSP, nor the Planning Board's resolution conditionally approving the PSP discuss Condition 18. We have not been cited to anything in this administrative record indicating that Peterson has submitted the Condition 18 engineering studies or equivalent information. We therefore cannot say whether Condition 18 has been satisfied. On remand, this matter also must be addressed.

## IV.

### Adequacy Of Findings Of Fact And Conclusions Of Law

The protestants' final contention of error is that the Board erred in approving the PSP without issuing sufficient written findings of fact and conclusions of law. They complain that the Board's resolution approving the PSP does not address certain conditions to the zoning map amendment, and incorporates the same errors with respect to other conditions that were made in the 1998 resolution approving the CSP. In their view, "[t]he Board and its staff did no more than provide conclusory excuses for Peterson's failure to submit evidence required by the Zoning Conditions which are part of the zoning map, and labeled the conclusory statements as findings." They point out that similar "boilerplate" findings have been rejected in many other cases. *See, e.g., Harford County v. Preston,* 322 Md. 493, 505, 588 A.2d 772 (1991)(case remanded for further findings of fact because the Board of Appeals did not explain why it reached a different conclusion than examiner, who determined that a proposed special exception use would not have adverse impact on a particular neighborhood); *Ocean Hideaway Condo. Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 659, 515 A.2d 485 (1986)(board erred in adopting findings of fact that merely recited factors that it was obligated to consider in approving special exception). *See also Annapolis Market Place, LLC v. Parker,* 369 Md. 689, 718–19, 802 A.2d 1029 (2002)(planning board erred in adopting

county employee's statement that there were no issues related to adequacy of public facilities, without making factual finding regarding whether there were adequate drainage systems).

As all parties acknowledge, failure either to make factual findings required by a condition on zoning approval, or to identify the evidence and factors considered in support of such a finding, requires remand. *See Annapolis Market Place,* 369 Md. at 718–19, 802 A.2d 1029; *Bucktail, LLC v. Talbot County Council,* 352 Md. 530, 553–54, 723 A.2d 440 (1999). Because our decision and detailed discussion of each specific zoning condition separately addresses which of the Planning Board's findings are inadequate, there is no need to analyze them collectively.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMING DECISION OF THE PRINCE GEORGE'S COUNTY PLANNING BOARD TO APPROVE PRELIMINARY SUBDIVISION PLAN 4–01048 REVERSED. CASE REMANDED TO PRINCE GEORGE'S COUNTY CIRCUIT COURT WITH INSTRUCTIONS TO REMAND TO THE PRINCE GEORGE'S PLANNING BOARD FOR FURTHER ADMINISTRATIVE PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN APPELLEES.**